**No. 26-20018**

IN THE

# United States Court of Appeals

FOR THE FIFTH CIRCUIT

IN THE MATTER OF WESCO AIRCRAFT HOLDINGS, INCORPORATED; WOLVERINE INTERMEDIATE HOLDING CORPORATION; WOLVERINE INTERMEDIATE HOLDING II CORPORATION; HAAS GROUP, L.L.C.; HAAS HOLDINGS, L.L.C.; ET AL.,

*Debtors,*

WESCO AIRCRAFT HOLDINGS, INCORPORATED; WOLVERINE INTERMEDIATE HOLDING CORPORATION; WOLVERINE INTERMEDIATE HOLDING II CORPORATION; HAAS GROUP, L.L.C.; HAAS HOLDINGS, L.L.C.; PLATINUM EQUITY ADVISORS, L.L.C.; WOLVERINE TOP HOLDING CORPORATION; PLATINUM EQUITY CAPITAL PARTNERS INTERNATIONAL, IV (CAYMAN), L.P.; CITADEL EQUITY FUND, LIMITED; WILMINGTON SAVINGS FUND, FSB; FIRST LIEN NOTEHOLDER GROUP; ET AL.,

*Appellees,*

*v.*

2026 NOTEHOLDERS,

*Appellants.*

*Appeal from the United States District Court for the Southern District of Texas, Houston Division, No. 4:25-CV-202, Hon. Randy Crane*

## BRIEF FOR APPELLANTS

Zachary D. Rosenbaum
Adam M. Lavine
Darryl G. Stein
KOBRE & KIM LLP
800 Third Avenue, 6th Floor
New York, New York 10022
212-488-1200

Candice C. Wong
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
801 17th Street, N.W.
Washington, D.C. 20006
202-639-7000

Samuel P. Groner
Jason S. Kanterman
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004
212-859-8000

*Counsel for Appellants*

PHP (212) 719-0990 appeals@phpny.com

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

| DEBTORS AND DEBTOR-APPELLEES | COUNSEL FOR DEBTORS AND DEBTOR-APPELLEES |
|---|---|
| • Wesco Aircraft Holdings, Inc.<br>• Adams Aviation Supply Company Ltd.<br>• Flintbrook Limited<br>• Haas Chemical Management of Mexico, Inc.<br>• Haas Corporation of Canada<br>• Haas Corporation of China<br>• Haas Group Canada Inc.<br>• Haas Group International SCM Limited<br>• Haas Group International, LLC<br>• Haas Group, LLC<br>• Haas Holdings, LLC<br>• Haas International Corporation<br>• Haas of Delaware LLC<br>• Haas TCM de Mexico, S. de R.L. de C.V.<br>• Haas TCM Group of the UK Limited<br>• Haas TCM Industries LLC<br>• Haas TCM of Israel Inc.<br>• Interfast USA Holdings Inc.<br>• NetMRO, LLC<br>• Pattonair (Derby) Limited | Christopher D. Porter<br>Cameron Kelly<br>**QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br>700 Louisiana Street, Ste 3900<br>Houston, TX 77002<br><br>Susheel Kirpalani<br>Victor Noskov<br>Anna Deknatel<br>Kenneth Hershey<br>**QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br>51 Madison Ave, 22nd Fl<br>New York, NY 10010<br><br>Charles A. Beckham, Jr.<br>**HAYNES AND BOONE, LLP**<br>1221 McKinney St., Suite 4000<br>Houston, TX 77010-2007 |

| | |
|---|---|
| • Pattonair Europe Limited<br>• Pattonair Group Limited<br>• Pattonair Holding, Inc.<br>• Pattonair Holdings Limited<br>• Pattonair Limited<br>• Pattonair USA, Inc.<br>• Pioneer Finance Corporation<br>• Pioneer Holding Corporation<br>• Quicksilver Midco Limited<br>• UNISEAL, Inc.<br>• Wesco 1 LLP<br>• Wesco 2 LLP<br>• Wesco Aircraft Canada Inc.<br>• Wesco Aircraft Canada, LLC<br>• Wesco Aircraft EMEA, Ltd.<br>• Wesco Aircraft Europe Limited<br>• Wesco Aircraft Hardware Corp.<br>• Wesco Aircraft International Holdings Limited<br>• Wesco Aircraft SF, LLC<br>• Wesco LLC 1<br>• Wesco LLC 2<br>• Wolverine Intermediate Holding Corporation<br>• Wolverine Intermediate Holding II Corporation<br>• Wolverine UK Holdco Limited | |

| APPELLANTS | COUNSEL FOR APPELLANTS |
|---|---|
| • Advanced Series Trust, on behalf of its portfolio AST High Yield Portfolio<br>• BlackRock Bank Loan Fund, by its manager BlackRock Asset Management Ireland Limited<br>• BlackRock Dynamic High Income Portfolio of BlackRock Funds II<br>• BlackRock Floating Rate Income Portfolio of BlackRock Funds V<br>• BlackRock Floating Rate Income Strategies Fund, Inc.<br>• BlackRock Floating Rate Income Trust<br>• BlackRock Institutional Trust Company, N.A., acting in its capacity as Trustee of the U.S. High Yield Bond Index Non-Lendable Fund B<br>• BlackRock Limited Duration Income Trust<br>• BlackRock Managed Income Fund of BlackRock Funds II<br>• HSBC Institutional Trust Services (Asia) Limited, as trustee of JPMorgan Multi Income Fund<br>• HSBC Institutional Trust Services (Asia) Limited, as trustee of JPMorgan Multi Balanced Fund<br>• IBM 401(k) Plus Plan Trust, on behalf of the IBM 401(k) Plus Plan<br>• iShares II Public Limited Company, on behalf of its sub-fund iShares $ High Yield Corp Bond UCITS ETF | Candice C. Wong<br>**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**<br>801 17th Street, NW<br>Washington, DC 20006<br><br>Samuel P. Groner<br>Jason S. Kanterman<br>**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**<br>One New York Plaza<br>New York, NY 10004<br><br>Zachary D. Rosenbaum<br>Adam M. Lavine<br>Darryl G. Stein<br>**KOBRE & KIM LLP**<br>800 Third Avenue<br>New York, NY 10022 |

| | |
|---|---|
| • iShares IV Public Limited Company, on behalf of its sub-fund iShares $ Short Duration High Yield Corp Bond UCITS ETF<br>• iShares Public Limited Company, on behalf of its sub-fund iShares Global High Yield Corp Bond UCITS ETF<br>• iShares Trust, on behalf of its series iShares 0-5 Year High Yield Corporate Bond ETF<br>• iShares Trust, on behalf of its series iShares Broad USD High Yield Corporate Bond ETF<br>• iShares Trust, on behalf of its series iShares Core 1-5 Year USD Bond ETF<br>• iShares Trust, on behalf of its series iShares Core Total USD Bond Market ETF<br>• iShares Trust, on behalf of its series iShares iBonds 2026 Term High Yield and Income ETF<br>• iShares Trust, on behalf of its series iShares iBoxx $ High Yield Corporate Bond ETF<br>• iShares U.S. High Yield Bond Index ETF (CADHedged), by its trustee, manager and portfolio adviser BlackRock Asset Management Canada Limited<br>• iShares VI Public Limited Company, on behalf of its sub-fund iShares Global High Yield Corp Bond CHF Hedged UCITS ETF (Dist) | |

| | |
|---|---|
| • iShares VI Public Limited Company, on behalf of its sub-fund iShares Global High Yield Corp Bond GBP Hedged UCITS ETF (Dist)<br>• iShares, Inc., on behalf of its series iShares US & Intl High Yield Corp Bond ETF<br>• J.P. Morgan Exchange-Traded Fund Trust, on behalf of its series JPMorgan Core Plus Bond ETF<br>• JNL Series Trust, on behalf of its series JNL/JPMorgan Global Allocation Fund<br>• JPMorgan Chase Bank, N.A., as Trustee of the Commingled Pension Trust Fund (Core Plus Bond) of JPMorgan Chase Bank, N.A.<br>• JPMorgan Chase Bank, N.A., as Trustee of the Commingled Pension Trust Fund (Corporate High Yield) of JPMorgan Chase Bank, N.A.<br>• JPMorgan Chase Bank, N.A., as Trustee of the Commingled Pension Trust Fund (High Yield) of JPMorgan Chase Bank, N.A.<br>• JPMorgan Chase Bank, N.A., as Trustee of the Commingled Pension Trust Fund (Income) of JPMorgan Chase Bank, N.A.<br>• JPMorgan Fund ICVC, on behalf of its sub fund JPM Global High Yield Bond Fund<br>• JPMorgan Fund ICVC, on behalf of its sub fund JPM Multi-Asset Income Fund<br>• JPMorgan Funds, on behalf of its sub-fund Global Bond Opportunities Fund | |

| | |
|---|---|
| • JPMorgan Funds, on behalf of its sub-fund Global Bond Opportunities Sustainable Fund<br>• JPMorgan Funds, on behalf of its sub-fund Income Fund<br>• JPMorgan Funds, on behalf of its sub-fund US High Yield Plus Bond Fund<br>• JPMorgan Investment Funds, on behalf of its sub-fund Global High Yield Bond Fund<br>• JPMorgan Investment Funds, on behalf of its sub-fund Global Income Conservative Fund<br>• JPMorgan Investment Funds, on behalf of its sub-fund Global Income Fund<br>• JPMorgan Investment Funds, on behalf of its sub-fund Income Opportunity Fund<br>• JPMorgan Trust I, on behalf of its series JPMorgan Global Allocation Fund<br>• JPMorgan Trust I, on behalf of its series JPMorgan Global Bond Opportunities Fund<br>• JPMorgan Trust I, on behalf of its series JPMorgan Income Builder Fund<br>• JPMorgan Trust I, on behalf of its series JPMorgan Income Fund<br>• JPMorgan Trust I, on behalf of its series JPMorgan Short Duration Core Plus Fund<br>• JPMorgan Trust I, on behalf of its series JPMorgan Strategic Income Opportunities Fund<br>• JPMorgan Trust I, on behalf of its series JPMorgan Total Return Fund | |

| | |
|---|---|
| • JPMorgan Trust II on behalf of its series, JPMorgan Core Plus Bond Fund<br>• JPMorgan Trust II, on behalf of its series JPMorgan High Yield Fund<br>• Kapitalforeningen PenSam Invest – PSI 84 US High Yield II<br>• Lincoln Variable Insurance Products Trust, on behalf of its series LVIP JPMorgan High Yield Fund<br>• National Employment Savings Trust Corporation, in its capacity as trustee of the National Employment Savings Trust<br>• NBI High Yield Bond ETF<br>• NBI Unconstrained Fixed Income ETF<br>• SSD Investments Ltd.<br>• The Integrity Fund on behalf of its series, Integrity High Income Fund<br>• The Public Trust of New Zealand (previously, The New Zealand Guardian Trust Company Limited), as Trustee for AMP Wholesale High Yield Bond Fund<br>• Zurich American Insurance Company | |

| **APPELLEES FIRST LIEN NOTEHOLDER GROUP** | **COUNSEL FOR APPELLEES** |
|---|---|
| • Bakery and Confectionery Union and Industry International Pension Fund<br>• BMO Global Strategic Bond Fund<br>• Desjardins Floating Rate Income Fund<br>• Desjardins Global Tactical Bond Fund<br>• Employees' Retirement System of the State of Rhode Island<br>• OC III LVS I LP<br>• PCM Fund, Inc.<br>• PIMCO Corporate & Income Opportunity Fund<br>• PIMCO Corporate & Income Strategy Fund<br>• PIMCO DISCO Fund III LP<br>• PIMCO Dynamic Income Fund<br>• PIMCO Dynamic Income Opportunities Fund<br>• PIMCO ETF Trust: PIMCO 0-5 Year High Yield Corporate Bond Index Exchange-Traded Fund<br>• PIMCO ETFs plc, PIMCO US Short-Term High Yield Corporate Bond Index UCITS ETF (previously identified as PIMCO Fixed Income Source ETFs plc, PIMCO Short-Term High Yield Corporate Bond Index Source UCITS ETF)<br>• PIMCO Flexible Credit Income Fund<br>• PIMCO Funds: PIMCO High Yield Spectrum Fund<br>• PIMCO Funds: PIMCO Low Duration Credit Fund | Paul D. Clement<br>C. Harker Rhodes, IV<br>Kevin J. Wynosky<br>Niccolo A. Beltramo<br>**CLEMENT & MURPHY, PLLC**<br>706 Duke Street<br>Alexandria, VA 22314<br><br>Eric D. Wade<br>John F Higgins, IV<br>**PORTER HEDGES LLP**<br>1000 Main St, Suite 3600<br>Houston, TX 77002<br><br>Neil Lieberman<br>Benjamin F. Heidlage<br>**HOLWELL SHUSTER & GOLDBERG LLP**<br>425 Lexington Avenue<br>New York, NY 10017 |

| | |
|---|---|
| • PIMCO Global Income Opportunities Fund<br>• PIMCO Global StocksPLUS & Income Fund<br>• PIMCO High Income Fund<br>• PIMCO Income Strategy Fund<br>• PIMCO Income Strategy Fund II<br>• PIMCO OP Trust Flexible Credit Fund, L.P.<br>• PIMCO Strategic Income Fund, Inc.<br>• PIMCO Tactical Income Fund<br>• PIMCO Tactical Income Opportunities Fund<br>• PIMCO Tactical Opportunities Master Fund Ltd.<br>• Silver Point Capital Fund, L.P.<br>• Silver Point Capital Offshore Master Fund, L.P.<br>• Silver Point Distressed Opportunities Fund, L.P.<br>• Silver Point Distressed Opportunities Offshore Master Fund, L.P.<br>• Silver Point Distressed Opportunity Institutional Partners Master Fund (Offshore), L.P.<br>• Silver Point Distressed Opportunity Institutional Partners, L.P.<br>• Silver Point SCF CLO I, Ltd.<br>• Silver Point Select Opportunities Fund A, L.P.<br>• Silver Point Specialty Credit Fund II Mini-Master Fund (Offshore), L.P.<br>• Silver Point Specialty Lending Fund<br>• Texas Children's Hospital Foundation | |

| **OFFICIAL COMMITTEE OF UNSECURED CREDITORS** | **COUNSEL** |
|---|---|
| • BOKF, NA<br>• Parker Hannifin Corporation<br>• Insight2Profit | Charles R. Gibbs<br>Jack G. Haake<br>**MCDERMOTT WILL & SCHULTE**<br>2501 North Harwood Street, Suite 1900 Dallas, TX 75201-1664<br><br>Kristin K. Going<br>Darren Azman<br>Deanna Boll<br>**MCDERMOTT WILL & SCHULTE**<br>One Vanderbilt Avenue<br>New York, NY 10017-5404<br><br>Lorenzo Marinuzzi<br>Theresa A. Foudy<br>Michael Birnbaum<br>Benjamin Butterfield<br>Raff Ferraioli<br>**MORRISON & FOERSTER LLP**<br>250 West 55th Street<br>New York, NY 10019-9601 |

| **PLATINUM PARTY APPELLEES** | **COUNSEL FOR PLATINUM PARTY APPELLEES** |
|---|---|
| • Platinum Equity Advisors, L.L.C.<br>• Platinum Equity Capital Partners International, IV (Cayman)<br>• Wolverine Top Holding Corporation | Dane H. Butswinkas<br>Ryan T. Scarborough<br>Ellen Oberwetter<br>Stephen Wohlgemuth<br>Matthew Heins<br>Joseph G. Catalanotto<br>**WILLIAMS AND CONNOLLY LLP**<br>680 Maine Avenue, S.W.<br>Washington, DC 20024 |
| **APPELLEE WILMINGTON SAVINGS FUND SOCIETY, FSB** | **COUNSEL FOR WILMINGTON SAVINGS FUND SOCIETY, FSB** |
| | Seth H. Lieberman<br>Patrick Sibley<br>Marion R. Harris<br>Kaveri Arora<br>**PRYOR CASHMAN LLP**<br>7 Times Square<br>New York, NY 10036<br><br>Paul E. Heath<br>**VINSON & ELKINS**<br>1001 Fannin Street, Ste 2500<br>Houston, TX 77002 |

| APPELLEE CITADEL EQUITY FUND, LIMITED | COUNSEL FOR APPELLEE CITADEL EQUITY FUND, LIMITED |
|---|---|
| | Thomas Edward Redburn, Jr.<br>Maya Ginsburg<br>**LOWENSTEIN SANDLER LLP**<br>1251 Avenue of the Americas<br>New York, NY 10020 |

**ADDITIONAL CORPORATE DISCLOSURE STATEMENT PURSUANT TO FED. R. APP. PRO. 26.1(A)**

1. The Appellants identified immediately below are managed or advised by wholly owned investment advisory subsidiaries of BlackRock, Inc. BlackRock, Inc. is a publicly traded corporation whose common stock is listed on the New York Stock Exchange. No person or entity owns more than 10% of the outstanding common stock of BlackRock, Inc.

- iShares Public Limited Company, on behalf of its sub-fund iShares Global High Yield Corp Bond UCITS ETF
- iShares II Public Limited Company, on behalf of its sub-fund iShares $ High Yield Corp Bond UCITS ETF
- iShares Trust, on behalf of its series iShares iBonds 2026 Term High Yield and Income ETF
- iShares Trust, on behalf of its series iShares Broad USD High Yield Corporate Bond ETF
- iShares Trust, on behalf of its series iShares 0-5 Year High Yield Corporate Bond ETF
- iShares Trust, on behalf of its series iShares iBoxx $ High Yield Corporate Bond ETF
- BlackRock Institutional Trust Company, N.A., acting in its capacity as Trustee of the U.S. High Yield Bond Index Non-Lendable Fund B

- iShares VI Public Limited Company, on behalf of its sub-fund iShares Global High Yield Corp Bond GBP Hedged UCITS ETF (Dist)
- iShares VI Public Limited Company, on behalf of its sub-fund iShares Global High Yield Corp Bond CHF Hedged UCITS ETF (Dist)
- iShares IV Public Limited Company, on behalf of its sub-fund iShares $ Short Duration High Yield Corp Bond UCITS ETF
- iShares Trust, on behalf of its series iShares Core 1-5 Year USD Bond ETF
- iShares Trust, on behalf of its series iShares Core Total USD Bond Market ETF
- iShares U.S. High Yield Bond Index ETF (CADHedged), by its trustee, manager and portfolio adviser BlackRock Asset Management Canada Limited
- iShares, Inc., on behalf of its series iShares US & Intl High Yield Corp Bond ETF
- BlackRock Bank Loan Fund, by its manager BlackRock Asset Management Ireland Limited
- BlackRock Floating Rate Income Trust
- BlackRock Limited Duration Income Trust
- BlackRock Dynamic High Income Portfolio of BlackRock Funds II
- BlackRock Floating Rate Income Portfolio of BlackRock Funds V
- BlackRock Managed Income Fund of BlackRock Funds II
- BlackRock Floating Rate Income Strategies Fund, Inc.

2. JPMorgan Chase & Co. is a publicly traded corporation whose common stock is listed on the New York Stock Exchange. JPMorgan Chase & Co. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock. Vanguard Group, Inc., an investment adviser, has reported that registered investment companies, other pooled investment vehicles and institutional accounts that it or its subsidiaries sponsor, manage or advise, have aggregate ownership under certain regulations of 10% or more of the stock of JPMorgan Chase & Co. JPMorgan Chase & Co. is a financial services holding company whose principal bank subsidiary, JPMorgan Chase Bank, N.A., serves as Trustee for the Appellants that are collective investment trusts identified immediately below:

- JPMorgan Chase Bank, N.A., as Trustee of the Commingled Pension Trust Fund (Core Plus Bond) of JPMorgan Chase Bank, N.A.
- JPMorgan Chase Bank, N.A., as Trustee of the Commingled Pension Trust Fund (Income) of JPMorgan Chase Bank, N.A.
- JPMorgan Chase Bank, N.A., as Trustee of the Commingled Pension Trust Fund (Corporate High Yield) of JPMorgan Chase Bank, N.A.
- JPMorgan Chase Bank, N.A., as Trustee of the Commingled Pension Trust Fund (High Yield) of JPMorgan Chase Bank, N.A.

3. JPMorgan Chase & Co. also wholly owns investment advisory subsidiaries which manage or advise the Appellants listed immediately below:

- JPMorgan Investment Funds, on behalf of its sub-fund Global High Yield Bond Fund
- JPMorgan Investment Funds, on behalf of its sub-fund Income Opportunity Fund

- JPMorgan Investment Funds, on behalf of its sub-fund Global Income Fund
- JPMorgan Investment Funds, on behalf of its sub-fund Global Income Conservative Fund
- JPMorgan Funds, on behalf of its sub-fund US High Yield Plus Bond Fund
- JPMorgan Funds, on behalf of its sub-fund Income Fund
- JPMorgan Funds, on behalf of its sub-fund Global Bond Opportunities Sustainable Fund
- JPMorgan Funds, on behalf of its sub-fund Global Bond Opportunities Fund
- JNL Series Trust, on behalf of its series JNL/JPMorgan Global Allocation Fund
- The Integrity Fund on behalf of its series, Integrity High Income Fund
- JPMorgan Trust II on behalf of its series, JPMorgan Core Plus Bond Fund
- JPMorgan Trust II, on behalf of its series JPMorgan High Yield Fund
- JPMorgan Fund ICVC, on behalf of its sub fund JPM Global High Yield Bond Fund
- JPMorgan Trust I, on behalf of its series JPMorgan Income Builder Fund
- JPMorgan Trust I, on behalf of its series JPMorgan Total Return Fund
- JPMorgan Trust I, on behalf of its series JPMorgan Strategic Income Opportunities Fund
- JPMorgan Fund ICVC, on behalf of its sub fund JPM Multi-Asset Income Fund
- Lincoln Variable Insurance Products Trust, on behalf of its series LVIP JPMorgan High Yield Fund
- Advanced Series Trust, on behalf of its portfolio AST High Yield Portfolio
- HSBC Institutional Trust Services (Asia) Limited, as trustee of JPMorgan Multi Income Fund
- HSBC Institutional Trust Services (Asia) Limited, as trustee of JPMorgan Multi Balanced Fund
- JPMorgan Trust I, on behalf of its series JPMorgan Global Bond Opportunities Fund
- JPMorgan Trust I, on behalf of its series JPMorgan Short Duration Core Plus Fund
- JPMorgan Trust I, on behalf of its series JPMorgan Global Allocation Fund
- IBM 401(k) Plus Plan Trust, on behalf of the IBM 401(k) Plus Plan
- JPMorgan Trust I, on behalf of its series JPMorgan Income Fund
- J.P. Morgan Exchange-Traded Fund Trust, on behalf of its series JPMorgan Core Plus Bond ETF

- Zurich American Insurance Company
- NBI High Yield Bond ETF
- NBI Unconstrained Fixed Income ETF
- National Employment Savings Trust Corporation, in its capacity as trustee of the National Employment Savings Trust

4. SSD Investments Ltd. has no parent that is a corporation.

5. The Public Trust of New Zealand, as Trustee for AMP Wholesale High Yield Bond Fund, has no parent that is a corporation. The New Zealand Guardian Trust Company Limited, the previous Trustee for AMP Wholesale High Yield Bond Fund, has no parent that is a corporation.

6. Kapitalforeningen PenSam Invest - PSI 84 US High Yield II has no parent that is a corporation.

*/s/ Candice C. Wong*
Candice C. Wong
*Attorney of record for Appellants*

April 29, 2026

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully submit that oral argument would be useful to the disposition of this appeal because the appeal presents important and recurring questions of law regarding the interpretation of debt contracts between companies and their lenders. Those issues arise in the context of "uptier transactions," complex financial transactions undertaken by companies with a subset of their lenders to restructure their debt, and their resolution has ramifications for capital markets broadly.

# TABLE OF CONTENTS


Certificate of Interested Persons ........ i

Statement Regarding Oral Argument ........ xvii

Table of Contents ........ xviii

Table of Authorities ........ xx

Statement of Jurisdiction ........ 1

Issues Presented ........ 2

Introduction ........ 2

Statement of the Case ........ 8

A. The Secured Notes Indenture ........ 8

B. The 2022 Uptier Transaction ........ 10

C. The Bankruptcy Court Proceedings And Trial ........ 20

D. The District Court Proceedings ........ 21

Summary of the Argument ........ 23

Standard of Review ........ 27

Argument ........ 28

I. The 2022 Uptier Transaction Breached the Indenture ........ 28

A. The 2022 Uptier Transaction "Ha[d] The Effect of" Releasing Collateral from Liens Without The Supermajority Consent Required by Section 9.02(1). ........ 28

B. The 2022 Uptier Transaction Amended Collateral-Related Provisions "In A[] Manner Adverse" to Original Noteholders Without The Supermajority Consent Required By Section 9.02(3). ........ 39

C. The 2022 Uptier Transaction Issued Additional Notes To "Directly Or Indirectly" Allow New, Impermissible Liens, Violating Sections 4.12(a) and 2.01(e). ........ 43

D. The District Court Hastily Rubberstamped The 2022 Uptier Transaction and Misread The Lessons Of *Serta*, and Affirming Would Upend Capital Markets. ........ 48

II. The District Court's "Remedy" for the Breach Was No Remedy at All ........ 54

Conclusion ..........................................................................................................61
Certificate of Service ...........................................................................................62
Certificate of Compliance .....................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*31 Holdings I, LLC v. Argonaut Ins. Co.*,
640 S.W.3d 915 (Tex. App. 2022) ....................56

*Amstar Corp. v. Domino's Pizza, Inc.*,
615 F.2d 252 (5th Cir. 1980) ....................49

*Anderson v. Bessemer City*,
470 U.S. 564 (1985)....................49

*Axos Fin., Inc. v. Reception Purchaser, LLC*,
88 Misc. 3d 1203(A) (N.Y. Sup. Ct. 2026) .................... 11, 36, 37, 50

*In re BankAtlantic Bancorp, Inc. Litig.*,
39 A.3d 824 (Del. Ch. 2012) ....................37, 56

*BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 2013 WL 1290394 (N.Y. Sup. Ct. Mar. 8, 2013) ....................57

*Beal Sav. Bank v. Sommer*,
865 N.E.2d 1210 (N.Y. 2007)....................32, 46

*Burrage v. United States*,
571 U.S. 204 (2014)....................31

*Comm'r v. Clark*,
489 U.S. 726 (1989)....................34, 36, 39

*In re ConvergeOne Holdings, Inc., et al.*,
No. 24-bk-90194 (Bankr. S.D. Tx. Sept. 25, 2025) ....................52

*In re Davis*,
3 F.3d 113 (5th Cir. 1993) ....................59

*Doody v. Ameriquest Mortg. Co.*,
242 F.3d 286 (5th Cir. 2001) ....................57

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625 (S.D.N.Y. 2010) ................................................47

*Entergy Ark., Inc. v. Nebraska*, 358 F.3d 528 (8th Cir. 2004) ........................................................................27

*In re First River Energy, L.L.C.*, 986 F.3d 914 (5th Cir. 2021) ........................................................................57

*Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, No. 5109-CS, 2013 WL 6327997 (Del. Ch. Dec. 4, 2013) ......................42, 43

*Frontera Generation Ltd. P'ship v. Mission Pipeline Co.*, 400 S.W.3d 102 (Tex. App. 2012) ................................................................56

*God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assoc., LLP*, 845 N.E.2d 1265 (N.Y. 2006)................................................................32

*Greene v. United States*, 13 F.3d 577 (2d Cir. 1996) ..........................................................................36

*Hartwell v. Lone Star, PCA*, 528 S.W.3d 750 (Tex. App. 2017) ................................................................56

*Jones v. Campbell-Taggart Associated Bakeries*, 63 F.2d 58 (5th Cir. 1933) ....................................................................55, 56

*Klein Coat Corp. v. Peretz*, 153 N.Y.S.2d 92 (N.Y. Sup. Ct. 1956)...................................................44, 45

*In re Luhr Bros., Inc.*, 157 F.3d 333 (5th Cir. 1998) ................................................................27, 49

*McBride v. Estis Well Serv., L.L.C.*, 768 F.3d 382 (5th Cir. 2014) ........................................................................27

*MeehanCombs Glob. Credit Opportunities Master Fund, LP v. Caesars Ent. Corp.*, 162 F. Supp. 3d 200 (S.D.N.Y. 2015) ..........................32

*In re Murray Energy Holdings Co.*, 616 B.R. 84 (Bankr. S.D. Ohio 2020) ..........................................................30

*Nau v. Vulcan Rail & Constr. Co.*,
36 N.E.2d 106 (N.Y. 1941)....................................................................36

*People v. Carillo*,
246 N.Y.S.2d 692 (N.Y. App. Div. 1964)....................................................45

*Powers v. Hamilton Cnty. Pub. Def. Comm'n*,
501 F.3d 592 (6th Cir. 2007)....................................................................39

*S. Cent. Jurisdictional Conf. of United Methodist Church v. S. Methodist Univ.*, 674 S.W.3d 334 (Tex. App. 2023)....................................56

*In re Serta Simmons Bedding, L.L.C.*,
125 F.4th 555 (5th Cir. 2024)............................... 2, 11, 27, 30, 32, 33, 51, 52

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982)..................................................................37, 53

*SSD Investments Ltd., et al. v. Wesco, et al.*,
No. 654068/2022 (N.Y. Sup. Ct.).................................................................59

*Texas Indus. Gas v. Phoenix Metallurgical Corp.*,
828 S.W.2d 529 (Tex. App. 1992)..............................................................59

*United States v. El Paso Nat'l Gas Co.*,
376 U.S. 651 (1964)....................................................................................49

*In re Wesco Aircraft Holdings, Inc., et al.*,
No. 23-bk-90611 (Bankr. S.D. Tx. Dec. 26, 2024)......................................60

*In re Wesco Aircraft Holdings, Inc., et al.*,
No. 25-cv-00161 (S.D. Tx. Dec. 22, 2025)..................................................60

**Statutes**

28 U.S.C. § 157..............................................................................................1

28 U.S.C. § 1334............................................................................................1

28 U.S.C. § 158..............................................................................................1

28 U.S.C. § 1291............................................................................................1

**Other Authorities**

American Heritage Dictionary (5th ed. 2022) .................................................30

Ballentine's Law Dictionary (3rd ed. 2010) ....................................................45

Black's Law Dictionary (12th ed. 2024) .................................. 30, 31, 33, 43, 44

Dictionary.com.............................................................................................31, 32

Mark J. Roe & Vasile Rotaru, *Liability Management's Limited Runway: Corporate Restructuring Today*, 136 Yale L.J. (forthcoming 2026) ..................................................................57, 58

Merriam-Webster's Collegiate Dictionary (12th ed. 2025)..........................30, 45

Oxford English Dictionary (3d ed. 2010) .........................................................45

Oxford English Dictionary (rev. 2008)..............................................................30

Restatement (Second) of the Law of Torts ........................................................31

Serta's Boardriders' Superpriority Uptier Exchanges Can Likely Be Replicated Under Most Existing Credit Facilities, OCTUS (Sept. 22, 2020) ...........................................................................................51

15 WILLISTON, CONTRACTS § 45:10 (4th ed. 2025) ............................................36

## STATEMENT OF JURISDICTION

Debtor-Appellee Wesco Aircraft Holdings, Inc. ("Wesco" or "the Company") filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of Texas on June 1, 2023. ROA.111. On January 17, 2025, the Bankruptcy Court issued a Report and Recommendation (the "R&R") addressing Appellants' breach-of-contract counterclaim in an adversary proceeding and recommending a ruling in favor of Appellants. ROA.89. The parties filed timely objections to the R&R before the U.S. District Court for the Southern District of Texas. ROA.13-18. On December 8, 2025, the District Court rejected the R&R, resolving the objections and entering final judgment for Appellees. ROA.4432; ROA.4483. On January 6, 2026, Appellants filed a timely notice of appeal. ROA.4485. The Bankruptcy Court and District Court had jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and this Court has jurisdiction under 28 U.S.C. §§ 158 and 1291.

## ISSUES PRESENTED

1. Whether the District Court erred in deciding, contrary to the Bankruptcy Court's ruling following a 35-day trial, that the 2022 Uptier Transaction did not breach the terms of the secured notes indenture.

2. Whether the District Court erred in deciding, contrary to the Bankruptcy Court, that if the 2022 Uptier Transaction breached the terms of the secured notes indenture, the only remedy would be a money damages claim that Appellants already have irrespective of the breach.

## INTRODUCTION

Less than two years ago, this Court spotlighted the "controversial" practice of "uptier transactions"—deals cut between a company and a favored subset of its lenders to the detriment of all other lenders. *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 565 (5th Cir. 2024). As this Court explained, an uptier transaction entails a company, for new money, "amend[ing] the terms" of a debt instrument "to allow the issuance of new super-priority debt" and allowing favored lenders "to exchange their existing debt for new super-priority debt." *Id.* The favored lenders are thereby "uptiered" to super-senior status at the very front of the line. The left-behind lenders are subordinated or muscled back in priority.

This case presents perhaps the most aggressive uptier transaction ever litigated. A majority group of secured noteholders of Wesco conceived of, in their words, a "Serta type transaction"—a reference to the 2020 uptier in *Serta*, which a unanimous panel of this Court resoundingly struck down. Their planned transaction would, for new money, uptier the Majority Group's holdings to new, super-senior notes. And it would not merely move other likewise-secured noteholders behind them in priority *but strip them of their security interests altogether*—worth hundreds of millions of dollars, or ultimately around a quarter of the Company's enterprise value—rendering the left-behind notes wholly unsecured and ultimately worthless.

The Majority Group correctly recognized at the outset that the plain terms of the indenture governing Wesco's secured 2026 notes prohibited any such transaction without the consent of a 66⅔% supermajority of secured noteholders. For months, the Majority Group sought to buy up notes and acquire the requisite supermajority. They agreed upon terms with the Company for the uptier, premised on the assumption that they would obtain the requisite 66⅔% share. They came to believe that they obtained 66⅔%. They then learned, at the eleventh hour, that they had not; they were stuck at 59.2% because Appellants, a Minority Group, had obtained more than a 33⅓% share. And when that reality hit them,

they devised a superficial repackaging of the same uptier transaction that attempted to paper over their lack of contractually required consent.

At the core of this appeal is whether the Majority Group's eleventh-hour repackaging turned a breach of straightforward contractual language into a compliant transaction. It did not. The supermajority consent requirement in the indenture was clear. The Majority Group's inability to achieve supermajority consent was likewise clear. The Majority Group and the Company simply resorted to *manufacturing* the appearance of consent they did not have.

Their gambit went as follows: With only simple majority consent, the Company purported to amend the indenture to allow it to issue new, "additional 2026 notes" on top of the Majority Group's existing 2026 notes and artificially inflate the Majority Group's share of 2026 notes past 66⅔%. This was a charade. The actual noteholders giving consent remained wholly unchanged. They merely claimed, with the nominal issuance of more notes, to have been reborn momentarily as a supermajority. In reality, the "additional 2026 notes" were in one fell swoop *issued, voted, canceled, and exchanged* for new, super-senior notes—mere phantoms used to manufacture the veneer of supermajority consent. The new, super-senior notes issued to the Majority Group, secured by liens stripped from the Minority Group, were always the preordained end-result of the uptier. And the uptier's participants ensured that the end-result was locked in from

the outset of the transaction, as they pre-arranged, pre-executed, and released *all* the transaction's components—the issuance, voting, cancellation, and exchange alike—on one closing call, *before* any new money even went to the Company.

As the Bankruptcy Court observed, these maneuvers were a "sleight of hand" aimed at ramming through the uptier the Majority Group had originally conceived of, but without the required consent. The indenture prohibited this subversion. The 2022 Uptier Transaction turned on its head the very purpose of a secured notes indenture, eviscerating the security interests of noteholders who had accepted the lower interest rate of secured notes over higher-paying unsecured notes precisely because of their greater protections. The repapering ran afoul of several provisions of the indenture that broadly protect those security interests. Section 9.02(1) prohibited the Company from enacting, without supermajority consent, not only any amendment that directly releases liens of noteholders, but also any amendment that "may … *have the effect*" of releasing such liens. Section 9.02(3) prohibited the Company from modifying, without supermajority consent, the security documents or the indenture provisions "dealing with Collateral" in "*any manner adverse*" to secured noteholders "*in any material respect*." And Section 4.12(a), as incorporated into § 2.01(e), prohibited the Company from issuing additional notes to "directly *or indirectly*" create, incur, or allow new, impermissible liens.

The 2022 Uptier Transaction flouted each one of those provisions, independently: The Company enacted, without supermajority consent, an amendment that "*ha[d] the effect*" of releasing the liens of all non-participating noteholders and zeroing out their investments in secured notes. The Company amended, without supermajority consent, the very definition of "Permitted Liens" to conjure permission to issue $250 million in additional notes to "adverse[ly]" affect the original notes. And the Company's issuance of that $250 million in additional notes "directly *or indirectly*" allowed new liens securing the new, super-senior notes issued to the Majority Group—the very point of the uptier—with collateral stripped from non-participating noteholders. Yet the indenture's plain terms ensured that this attempted end-run never got past the start line.

There could not have been a starker contrast between how the Bankruptcy Court and the District Court assessed the legality of the 2022 Uptier Transaction. The Bankruptcy Court—which found that the transaction breached the indenture and was thus ineffective—presided over a 35-day trial, heard testimony from 21 witnesses, reviewed hundreds of exhibits, and considered and supplemented rounds of briefing. It issued meticulous oral and written rulings recounting the factual history of the parties' negotiations and mechanics of the transaction, distilling the voluminous evidence, and detailing its legal conclusions. By contrast, the District Court—which says there was no breach—summarily

rejected the Bankruptcy Court's conclusions from the bench at a 19-minute initial status conference. The District Court then outsourced the writing of its opinion, *and the reasoning therein*, to the Majority Group. And it adopted the entirety of Appellees' 40-page wish-list of rationales effectively *verbatim*, adding only nine words of its own.

That juxtaposition says everything about how those courts came to their decisions and how this Court should weigh their respective assessments. As the Bankruptcy Court recognized, the Majority Group and Company were thwarted in their Plan A—to achieve a bona fide supermajority—and resorted to Plan B, gambling on a manufactured appearance of the supermajority they lacked. But the indenture by its plain terms sweeps broadly to prohibit such circumvention. The indenture does not countenance this end-run, nor should this Court. This Court should reverse the District Court's decision and remand with instructions to adopt the Bankruptcy Court's recommendations.

## STATEMENT OF THE CASE

### A. The Secured Notes Indenture

Wesco is a distribution and supply chain services provider in the aerospace industry. ROA.90; ROA.4432. The current Wesco is the product of a 2020 leveraged buyout—an acquisition financed by a significant amount of borrowed money secured by the target's assets—in which Platinum Equity Advisors, LLC ("Platinum") acquired Wesco and merged it with one of its existing portfolio companies. ROA.90-91.

Platinum was initially unable to secure a term loan in the credit markets to fund the leveraged buyout. ROA.39654-39656; ROA.27959. Platinum thus "'relaunch[ed]' with an all [high-yield bond] structure," which provided greater protections to secured lenders and enabled it to ultimately raise $2.075 billion in financing through three bond issuances. ROA.39654-39656. As relevant here, the Company sold $900 million in senior secured bonds paying 9% that would mature in 2026 ("2026 notes") through an indenture. ROA.90; ROA.4433.[1]

The market recognized that Wesco's highly leveraged acquisition required robust lender protections. The indenture, and its accompanying security documents, provide for "Liens" securing the 2026 notes—which encompassed

[1] The Company also sold, through two separate indentures, $650 million in senior secured bonds paying 8.5% that would mature in 2024 ("2024 notes") and $525 million in unsecured notes paying 13.125% that would mature in 2027 ("2027 notes"). ROA.90; ROA.4433.

any "mortgage, lien, pledge, charge, security interest or encumbrance" of an asset, or "any option or other agreement to sell or give a security interest"—on the "Collateral." ROA.77140. That "Collateral" encompasses the Wesco assets and property "with respect to which a Lien is granted … as security." ROA.77124. The holders of the 2026 notes thus paid more and accepted lower interest rates for secured notes, bargaining that the security interests would protect them if the highly leveraged Company found itself in financial distress.

Section 9.02 of the indenture sets forth consent thresholds for amendments to the indenture. It lays out simple-majority consent as the default. ROA.77240. But § 9.02 also carves out exceptions to that default, where heightened consent is required. ROA.77240-77241. Certain amendments require unanimous consent, and three broad categories of amendments affecting noteholders' security interests require supermajority consent:

> [W]ithout the consent of the Holders of *at least 66⅔%* in aggregate principal amount of the [Original] Secured Notes then outstanding … *no amendment, supplement or waiver may*
>
> (1) *have the effect of releasing all or substantially all of the Collateral from the Liens* created pursuant to the Security Documents … or changing or altering the priority of the security interests of the Holders of the [Original] Secured Notes in the Collateral….
>
> (2) make any change in the Security Documents … or the provisions in this Indenture dealing with the application of proceeds of the Collateral that would adversely affect the Holders of the [Original] Secured Notes or

(3) modify the Security Documents or the provisions of this Indenture *dealing with Collateral in any manner adverse* to Holders of the [Original] Secured Notes *in any material respect….*

ROA.77241 (emphases and paragraph breaks added).

To further protect security interests, other indenture provisions restrict what, if any, *new* liens are permitted. "Permitted Liens" are defined to include, *inter alia*, "Liens securing the [Original] Secured Notes," ROA.73781-82, as well as a limited amount (here, $75 million) of additional secured notes. ROA.9209:15-9210:6. Those lien baskets—the limited amount of additional secured notes that could be issued beyond the original secured notes—were heavily negotiated before issuance of the 2026 notes, with noteholders ultimately prevailing to tighten the baskets to protect against dilution of the original debt. ROA.6146:23-6149:11; ROA.9956:11-9957:24; ROA.9204:18-9206:18; ROA.9209:11-9210:6; ROA.8413:15-23; ROA.8787:21-8788:13. Sections 4.12(a) and 2.01(e) further protect that bargain, prohibiting Wesco from issuing additional secured notes if doing so would "directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind (other than Permitted Liens)." ROA.77210; ROA.77164.

**B. The 2022 Uptier Transaction**

In September 2021, PIMCO and Silver Point—also known as the "First Lien Noteholder Group" Appellees, who co-led the Majority Group of 2026 noteholders—conceived of an uptier transaction that they knew required a

supermajority vote under the indenture. Uptier transactions are a "relatively new and controversial" practice in which a company allows favored lenders to "exchange their existing debt for new super-priority debt, often at an above-market price," thereby leapfrogging other lenders in priority. *Serta*, 125 F.4th at 565. The costs of uptiers are "are born entirely by the minority lenders" excluded from the transaction. *Id.* at 567. Such transactions have been described as creating "a zero-sum game of 'lender-on-lender violence'" that "'often hinge[s] on dubious claims of legal right,'" *id.* at 565, 569 n.6, or amounting to "lender bullying," *Axos Fin., Inc. v. Reception Purchaser, LLC*, 88 Misc. 3d 1203(A), at *2 (N.Y. Sup. Ct. 2026).

PIMCO and Silver Point expressly envisioned a "'Serta type transaction where 2/3 of the'" noteholders would put in new money on a super-senior basis and "'elevate[] above the other 1/3.'" ROA.93. That is, they would offer new money to Wesco in exchange for super-senior notes that would elevate themselves and subordinate all others. Recognizing their need to acquire a two-thirds supermajority to accomplish any uptier, they attempted to increase their holdings of 2026 notes to reach the 66⅔% threshold. ROA.93.

In November 2021, PIMCO and Silver Point told the Company that they "collectively own (or are very close to owning) two-thirds of each of [the Company's] secured notes," ROA.104073:17-22, and thus would "have the

ability to deliver an amendment." ROA.10474:17-24. In December 2021, they proposed the uptier, whereby they would lend new money for an exchange of their 2026 notes into new, super-senior, first-lien notes. ROA.93-94; ROA.78039. That proposal stated, "Consent Required [for] Secured Notes: 66 2/3% of each tranche." ROA.78038-78041. Thereafter, PIMCO and Silver Point expanded their group to include Citadel and Senator Investment Group because they recognized that "additional institutions w[ere] required to obtain the requisite 66 2/3% vote." ROA.95-96.

By February 2022, the Majority Group believed, mistakenly, that they had acquired the requisite supermajority. ROA.6279:15-24; ROA.6280:18-6282:22; ROA.104914:5-104916:15. PIMCO and Silver Point's financial advisor, for example, reported to the Company that the Majority Group held 67.1% of the 2026 notes measured against the "two-thirds consent threshold." ROA.104915:22-104916:3. Silver Point likewise asserted that "[w]e're at exactly 67.1 percent." ROA.104111:18-21; ROA.6280:18-6281:15. Citadel, too, confirmed that it was "to be part of a two-thirds voting transaction." ROA.9475:21-25. However, the Majority Group erroneously counted unsettled trades and notes out on loan, which were ineligible to vote. In reality, the Majority Group could only cast *59.2%* of the outstanding notes—short of the 66⅔% needed. ROA.105; ROA.104143:6-104144:25.

Panic ensued. PIMCO was "worried enough" that it wanted "to be a bit over," otherwise "there would not be the ability ... to vote 66 and two-thirds of the 2026 bonds." ROA.6291:6-17. Silver Point implored another potential participant "to rip back" its 2026 notes that were out on loan to help reach the 66⅔% share. ROA.104140:2-19; ROA.6307:2-6309:19.

By this point, Silver Point knew that the Minority Group—Appellants—had also proposed a financing solution for the Company. ROA.104929:24-104930:14; ROA.6339:11-6340:19. The Minority Group notified the Company that they held "36.02% of the outstanding 2026 Notes," more than "one-third of the aggregate amount of 2026 Notes," when it made its own financing proposals in February and March 2022. ROA.100; ROA.78132-78134. The Minority Group's proposals would not have required any amendments to the indenture, and each would have been open to all secured noteholders. ROA.100-104; ROA.78132. The Company, however, feared that "PIMCO and Silver Point were in a 'power position' that would allow them to prevent Wesco from getting financing from other sources." ROA.103-104; ROA.5402:24-5403:3. The Company's "lack of engagement" with the Minority Group's proposals was, as the Bankruptcy Court later observed, "striking." ROA.101-102; ROA.104.

Instead, the Company agreed in late February 2022 to the Majority Group's uptier, whereby the Majority Group would lend new money for new, super-senior

first-lien notes, which they would also receive in exchange for their existing 2026 notes.[2] ROA.94. But when time came to execute the uptier, the Majority Group still lacked the 66⅔% share. Recognizing that the PIMCO-Silver Point "Group owned less than 2/3's of the 2026 note[s]" and expressly acknowledging the transaction "*would harm the excluded holders' security interest* in the collateral," the Company's Board nonetheless voted to "approve[]" the uptier. ROA.5398:1-4; ROA.5401:1-4 (emphasis added); *see also* ROA.11740:9-13 (Debtors, at closing arguments, acknowledging that priming debt "adversely affects" subordinated noteholders). They opted to barrel ahead on the fiction that working in purported "steps" would allow them to manufacture consent the Majority Group lacked.

Yet this was, per Appellees' own witnesses, "a single unified transaction." ROA.7094:20-22. For PIMCO and Silver Point, *ex ante* assurance of performance of each and every step, especially of the ultimate exchange of notes for super-senior notes, was necessary. Because they were "funding new money" and would not provide that "without also receiving super[-]senior first out debt," they were adamant that "[h]aving *certainty* that everyone *performs under each*

---

[2] The exchange also entailed exchanging 2024 notes of the Majority Group for super-senior first-lien notes and exchanging 2027 notes held by Carlyle Group, Senator, and Platinum for super-senior second-lien notes. Neither is implicated by this appeal. The 2027 indenture did not include a supermajority threshold, and the Majority Group *did* amass 66⅔% of 2024 notes.

*document* once this thing gets started has been a fundamental point for us from day 1." ROA.119 (emphases added); ROA.7115:7-10; ROA.104191:4-104192:5.

By design, all "steps" were to happen and all documents released contemporaneously. The night before closing, PIMCO and Silver Point instructed counsel to "release signature pages ... *concurrent* with the release of all other parties' signature pages." ROA.109 (emphasis added). All participants pre-agreed that "everything happens in order and at the same time." ROA.109. By the morning of the closing, all transaction documents were pre-executed and circulated to all participants. ROA.109; ROA.9889:3-10; ROA.9894:9-9895:4. The Company had signed instructions to *both* "order and cancel" the additional 2026 notes before the transaction even closed. ROA.5168:1-4. All signatures were already affixed; the documents were simply in escrow, pending ceremonial "release" of signatures on the closing call. ROA.109.[3] All needed funds were placed in escrow in advance of the call.

The purported "steps"—components of the single, unified, pre-executed 2022 Uptier Transaction—were papered as follows, *see* ROA.107-109:

---

[3] That the "release" of the Exchange Agreement on the closing call was ceremonial was underscored by the Agreement's terms specifying that it would "become effective" upon each party "hav[ing] received … the signatures of each of the other parties hereto," including "by electronic mail in .pdf"—receipt that occurred *before* the closing call. ROA.22942.

- *first*, the Majority Group would give simple-majority consent to Wesco amending the indenture—through a "***Third Supplemental Indenture***"—to expand the "Permitted Liens" definition to include $250 million in "additional 2026 notes" that would be *pari passu*, or on equal seniority footing, with existing 2026 notes;
- *second*, the Majority Group would be issued—through a ***Note Purchase Agreement***—the $250 million in phantom "additional 2026 notes" (while the Company netted only $208 million in new money, ROA.11213:15-11214:5);
- *third*, the Majority Group, their vote share supposedly boosted by the phantom notes, would provide "supermajority" consent to another amendment—a "***Fourth Supplemental Indenture***"—directing the release of all liens that had secured the 2026 notes and allowing for the issuance of new, super-senior debt;
- *fourth*, the Majority Group would execute an ***Exchange Agreement*** and deliver all of their now-unsecured 2026 notes to the Company in exchange for $772 million in new, super-senior notes; and
- *fifth*, the Majority Group, as holders of new super-senior notes, would be granted first-liens through an amended ***Notes Security Agreement***.

The following diagram illustrates how the 2022 Uptier Transaction purported to unfold. (The diagram reflects only the 2026 notes held by the parties in this litigation, omitting the notes of non-parties and the parties' non-2026 notes.) The Majority Group's precondition for lending $250 million was the exchange of their notes for new, super-senior notes, and when their lack of a supermajority prevented them from attaining this directly, they sought to engineer that end-result by papering these "steps":



As the diagram demonstrates, the tacked-on "steps" entailed the issuance of $250 million in "additional 2026 notes"—phantom notes that were issued-canceled-voted-and-exchanged for new, super-senior notes in one fell swoop.

In fact, *all* so-called "steps"—the issuance, voting, cancellation, *and* exchange of those notes—were memorialized in documents released on the 10-minute closing call at 8:15am on March 28, 2022. ROA.110. Pursuant to a script, each law firm was asked to "authorize release of their clients' signature pages" and told that release was to "be without any further action by any party." ROA.110-111. Each firm so confirmed, and after the call ended, "there was nothing else to be agreed upon or negotiated in connection with the 2022 Transaction." ROA.110-111; ROA.107706:2-9.

Notably, the transaction documents themselves were integrated across "steps." For instance, the Exchange Agreement had an integration clause specifying that "[t]his Agreement *and the other Transaction Documents constitute the entire contract* between the parties with respect to the Exchange." ROA.22943 (emphasis added); *see also* ROA.22919 (defining "Transaction Documents" as including "the Note Purchase Documents"). The documents likewise failed to hew to their supposed sequencing. An attachment to the Note Purchase Agreement, for instance, presupposed that the 2026 notes "are no longer secured by the Liens," even though the lien-release "step" was not supposed to

happen until *after* the Fourth Supplemental Indenture. *See* ROA.32323. One of the parties to that document was the collateral agent for the new super-senior notes, even though those notes should not have existed until *after* the Exchange Agreement. *See* ROA.32380.

In any event, no new money changed hands until the closing call had ended, when *all* documents had been released and made automatically effective. One minute after the call's conclusion, at 8:26am, PIMCO and Silver Point's counsel confirmed to their clients that "signature pages have now been released and we have confirmed release of the funds held in the escrow account." ROA.110. A Citadel internal email noted that the "transaction has officially closed." ROA.110; ROA.107317:19-107318:18. Within another minute, at 8:27am, counsel for the indenture trustee similarly confirmed the release of funds. ROA.107317:19-107318:18.

The 2022 Uptier Transaction thus consummated, the Minority Group's positions were moved from secured, predominantly first-lien status to wholly unsecured, behind even formerly-unsecured notes.[4]

[4] As part of the 2022 Uptier Transaction, Wesco permitted participating 2027 noteholders to exchange previously-*unsecured* 2027 notes for junior-lien *secured* notes—pulling them ahead in priority of the Minority Group's previously-*secured* 2026 notes. ROA.94.

## C. The Bankruptcy Court Proceedings And Trial

On October 28, 2022, Appellants sued in New York state court to challenge the 2022 Uptier Transaction. ROA.4444. While that suit was pending, Wesco's financial condition deteriorated further.

On June 1, 2023, the Company filed a Chapter 11 petition in U.S. Bankruptcy Court for the Southern District of Texas and initiated an adversary proceeding related to the New York suit. ROA.4444. Among factors the Company said precipitated its Chapter 11 filing was the "drain on … liquidity" posed by an indemnification obligation the Majority Group imposed on the Company as part of the uptier. ROA.5186:2-6. On June 26, 2023, the Minority Group filed counterclaims, seeking a declaration that the 2022 Uptier Transaction breached the indenture. ROA.112; ROA.4444. An amended complaint by the Company sought a declaration that it had not breached. ROA.24969-24970; ROA.24973.

The Honorable Marvin Isgur presided over the bankruptcy case, including a 35-day trial. ROA.115. The Bankruptcy Court issued oral rulings on July 10, 2024, after which the parties agreed on a plan of reorganization allowing the Company to emerge from bankruptcy. An R&R followed on January 17, 2025, concluding that the 2022 Uptier Transaction breached the indenture based on § 9.02(1) (and did not address other alleged breaches of the indenture). ROA.89-124. The Bankruptcy Court concluded that based on the transaction's very

structure as a "domino agreement" in which each "step" triggered the next, the Third Supplemental Indenture "*had the effect*" of releasing liens securing the 2026 notes. ROA.119-120 (emphasis added). Because the Third Supplemental Indenture was "not properly approved" by a supermajority, the transaction "failed at the execution of the very first document." ROA.120; ROA.123. And because the 2022 Uptier Transaction had been ineffective, the Bankruptcy Court recommended a declaration recognizing that the "rights, liens, and interests" of 2026 noteholders remained as they were *pre*-Transaction. ROA.124.

## D. The District Court Proceedings

Both the Majority Group and Company objected to the R&R. They argued that the Bankruptcy Court's recommended findings presented "pure question[s] of law" for the District Court's review. ROA.231. They did not challenge any factual findings. ROA.203-248. Appellants entered limited objections to the extent the R&R had not addressed breach based on indenture provisions beyond § 9.02(1). ROA.363.

On September 11, 2025, the Honorable Randy Crane presided over a 19-minute initial status conference in District Court. ROA.12165. The Court announced that it would vacate the Bankruptcy Court's rulings because it "believe[d] the 2022 transactions were perfectly proper and appropriate." ROA.12171:17-18. It professed not to know "what caused Judge Isgur to find

differently" but recognized that "[s]ometimes when you actually see the witnesses testifying" a judge may see things differently. ROA.12174:5-12.

The District Court's few substantive comments reflected factual misunderstandings. It reasoned, for instance, that the Minority Group "at one point was sort of trying to do this to the majority." ROA.12172:20-22. When Appellants clarified that the Minority Group proposals "were not trying to do to the others what was being done to them" because "they were open to all holders" on a *pro rata* basis "unlike the exclusionary transactions," the Court backtracked. ROA.12175:1-12. The Court asserted that nonetheless, the Minority Group "could have raised enough capital to do this same transaction, right? I mean, they could have – [gotten] up to 66 and two-thirds…. They would have to -- [have] bought a lot more indentures…." ROA.12175:15-23. In fact, *neither* the Majority nor Minority Group could have attained a supermajority by buying notes—precisely why the Company resorted to issuing additional 2026 notes.

Appellants repeatedly asked for oral argument before any ruling from the District Court but those requests were denied. ROA.12173:8-19; ROA.12176:11-13 ("Yeah. I don't need argument. I know the facts. All right. So who's now prevailing?"). Yet with no written order prepared because its law clerks were "new," the Court "task[ed]" Appellees with "preparing a proposed order" and clarified that they need not feel bound to "describe [the Court's] reasoning …

based on the transcript" because the Court could "revise" it. ROA.12172:9-14, 12176:18-24.

On December 8, 2025, the District Court adopted Appellees' proposed 40-page order *verbatim*, other than adding nine words. *Compare* ROA.4062 *with* ROA.4432. That order adopted Appellees' wholesale substitution of the Bankruptcy Court's unobjected-to recitation of the factual background, and made no mention of Appellants' 94-page line-by-line objections to the proposed order. ROA.4219-4313. The Court held that the Third Supplemental Indenture did not breach the indenture and that even if there were a breach, the only remedy for the Minority Group would be a money damages award, not the Bankruptcy Court's recommended declaration. ROA.4465.

On March 17, 2026, while this appeal was pending, the District Court proceedings were reassigned to the Honorable Kenneth Hoyt.

## SUMMARY OF THE ARGUMENT

Wesco's 2022 Uptier Transaction was unprecedented—a first-of-its-kind gambit to manufacture consent by the transaction's end that was indisputably missing at the transaction's start. This ploy to end-run a consent threshold was, on its face, fundamentally contrary to the underlying secured notes indenture, a document whose purpose is to protect noteholders and their security interests and bind the issuing company to its obligations. That document did not contemplate

that a simple majority of noteholders could wrest fellow secured noteholders of their predominantly first-lien security interests and move them to the bottom of the priority stack, leaving them wholly unsecured and with notes of ultimately zero value.

To the contrary, the indenture contained clear protections of noteholders' security interests. Section 9.02(1) broadly restricts the Company's ability to release liens securing the original notes, requiring supermajority consent for any amendment that "may … *have the effect*" of lien-release. Section 9.02(3) broadly restricts the Company's ability to amend provisions "dealing with Collateral," requiring supermajority consent for any amendments that are "*in any manner adverse*" and "material" to secured noteholders. Section 4.12(a), as incorporated into § 2.01(e), broadly restricts the Company's ability to allow new liens not permitted under the original indenture, providing that any issuance of additional secured notes may not "directly *or indirectly*, create, incur, assume *or suffer to exist any Lien of any kind* (other than Permitted Liens)." Each of those restrictions contains broad language that serves to prevent circumvention. What the Majority Group and Company attempted here was textbook circumvention in breach of the indenture and should not stand.

After a 35-day trial, the Bankruptcy Court soundly rejected this attempted end-run. The Bankruptcy Court acknowledged that the Majority Group and

Company had sought to paper the transaction in "steps," but correctly saw all components as part and parcel of one package deal—what it termed a "domino agreement" composed of interrelated parts that worked together. The "effect" of the first domino, it reasoned, could not be disentangled from its causal precipitation of the remaining dominos. Accordingly, the Bankruptcy Court concluded that even the indenture's so-called first step—the Third Supplemental Indenture—"*ha[d] the effect*" of releasing liens. It found that because the Third Supplemental Indenture was enacted without supermajority consent, that rendered the 2022 Uptier Transaction ineffective at its first step. Thus, it declared, the rights, liens, and interests of the Appellants remained in full force and effect, precisely as they had been pre-Transaction.

The District Court reduced the Bankruptcy Court's exhaustive proceedings to naught, rubberstamping the 2022 Uptier Transaction as permissible under the indenture. It did not deny that the 2022 Uptier Transaction had the effect of lien-release. Nor did it deny that the transaction allowed new impermissible liens. Nor did it deny that "additional 2026 notes" were issued-voted-canceled-and-exchanged for the purpose of accomplishing that very lien-release and allowance of new liens. Instead, the District Court parsed each of the "*steps*" comprising the 2022 Uptier Transaction in isolation, playing up their nominal divisions. Asserting that it was the Fourth Supplemental Indenture, not the Third, that *in and*

*of itself* effectuated lien-release and allowed new liens, the District Court concluded that the 2022 Uptier Transaction was "perfectly proper and appropriate." And lest it stop there, the District Court likewise endorsed Appellees' remarkable position that, even if the 2022 Uptier Transaction *had* breached the indenture, the Majority Group should retain the benefits of the breach and leave the excluded noteholders with no meaningful remedy.

Those Appellee-drafted conclusions cannot be squared with the indenture's plain text. And contrary to this Court's guidance in *Serta*, they elevate form over substance—here, the admitted substance being that this was one "singular transaction that was negotiated in its totality." ROA.5160:3-10. Appellees themselves described the steps of the 2022 Uptier Transaction as "part of the same egg that you can't unscramble." ROA.4569:8-19. Yet their strained claims to have complied with each indenture provision hinge on unscrambling what cannot be unscrambled.

If left to stand, the District Court's endorsement of the 2022 Uptier Transaction would have far-reaching practical reverberations on capital markets. Such a precedent would upset bedrock expectations that plain-language protections and contractual commitments will be honored and enforced. It would be open season for majority groups to manufacture consent to end-run consent thresholds. And it would embolden still more aggressive, exclusionary ploys to

wrest secured lenders of their security interests. If the 2022 Uptier Transaction exemplifies a "perfectly proper and appropriate" transaction, ROA.12171:16-18, then anything goes.

## STANDARD OF REVIEW

This Court reviews a district court's interpretation of a contract *de novo. See Serta*, 125 F.4th at 578. This Court also reviews a district court's determination of "whether a particular remedy is available and appropriate" *de novo*. *Entergy Ark., Inc. v. Nebraska*, 358 F.3d 528, 553-54 (8th Cir. 2004); *see also McBride v. Estis Well Serv., L.L.C.*, 768 F.3d 382, 385 (5th Cir. 2014). Where a district court has engaged in "[t]he practice of 'rubber-stamping' findings" and adopting *verbatim* submissions of prevailing parties with "minimal revision," such findings should be "approach[ed] … with 'caution.'" *In re Luhr Bros., Inc.*, 157 F.3d 333, 338, n.4 (5th Cir. 1998).

# ARGUMENT

## I. THE 2022 UPTIER TRANSACTION BREACHED THE INDENTURE

### A. The 2022 Uptier Transaction "Ha[d] The Effect of" Releasing Collateral from Liens Without The Supermajority Consent Required by Section 9.02(1).

The 2022 Uptier Transaction—an upending of security interests designed to leave more than one-third of the 2026 secured noteholders wholly unsecured—laid waste to the very protections of security interests undergirding this (and every) secured notes indenture. As the Bankruptcy Court recognized, this transaction breached the plain terms of § 9.02(1) of the indenture. Section 9.02(1) provides that without supermajority support of votable notes—supermajority consent—"no amendment, supplement, or waiver may … *have the effect* of releasing all or substantially all of the Collateral from the Liens." ROA.117 (emphasis added). That broad protection against amendments releasing liens or *having the effect of doing so* was squarely violated by the Majority Group-engineered maneuvers.

It is beyond dispute that the 2022 Uptier Transaction was initiated without supermajority consent. *See* ROA.11382:4-8 (Debtors acknowledging that "we didn't have the two-thirds" for the Third Supplemental Indenture). It is likewise beyond dispute that the 2022 Uptier Transaction "ha[d] the effect" of releasing all or substantially all of the collateral from the liens of original secured notes—

indeed, stripping the excluded noteholders of their liens altogether. In fact, the Company conceded in its Answer that "the 2022 Transaction *included the release of the liens* securing the then-outstanding secured notes." ROA.24974-24975 (emphasis added); *see also* ROA.24938 (acknowledging that "the 2022 Transaction" entailed "releas[ing] the liens securing the … 2026 Notes"). As the record makes clear, hundreds of millions of dollars in security interests were redistributed to the participating Majority Group from the non-participating Minority Group, which went from holding secured notes to wholly unsecured notes at the very bottom of the stack, below even formerly-unsecured notes.

The District Court, however, saw the lien-stripping wrought by the 2022 Uptier Transaction as beside the point. Instead, the District Court gave credence to the Majority Group's legal theory that the "effect" of the first step should be assessed in complete isolation—that is, by looking to "the *immediate* effect of the [Third Supplemental Indenture] *itself*," in a vacuum, divorced from the context and operation of the 2022 Uptier Transaction. ROA.4453 (emphases added). The District Court contended that lien-stripping was not an "immediate effect" of the Third Supplemental Indenture "itself," merely a "subsequent action[]" to be disregarded. *Id.* This was error—as a textual matter, as a functional matter, and as matter of economic substance.

As a textual matter, courts applying New York law, which governs the indenture, "look to dictionaries to understand the meaning of contractual terms." *Serta*, 125 F.4th at 578. Here, as the Bankruptcy Court summarized, "effect" refers to "*resulting* effect." ROA.119 (emphasis added). "Effect" is defined by Black's Law Dictionary as "[s]omething produced by an agent or cause; a result, outcome, or consequence," or alternately, "'[t]o bring about' or 'to make happen.'" ROA.118-119 (quoting *Effect*, Black's Law Dictionary (12th ed. 2024)). Other dictionaries define "effect" in near-identical fashion. *See, e.g.*, *Effect*, American Heritage Dictionary (5th ed. 2022) ("Something brought about by a cause or agent; a result."); Oxford English Dictionary (rev. 2008) ("results in general; the quality of producing a result"); Merriam-Webster's Collegiate Dictionary (12th ed. 2025) ("to cause or bring about (something)"). A bankruptcy court construing near-identical language to § 9.02 in a credit agreement—providing that "no amendment ... shall be effective if the effect thereof would ... release all or substantially all of the Collateral"—thus concluded that the language "signal[ed] *a causal relationship* in which the amendment is the cause and the release [is] the effect." *In re Murray Energy Holdings Co.*, 616 B.R. 84, 98-99 (Bankr. S.D. Ohio 2020) (emphasis added).

Section 9.02's plain terms thus cover amendments that *cause, bring about, or make happen* a lien-release. As even the District Court's alternative

definition—a secondary definition from Black's Law Dictionary—indicates, the assessment of "effect" entails considerations beyond the instrument itself. In relying on the Appellee-drafted opinion, the District Court may not have realized its only-partial-quotation of that definition: "The result that an instrument between parties will produce on their relative rights … *as discovered from the language used, the forms employed, or other materials for construing it.*" *Effect*, Black's Law Dictionary (12th ed. 2024) (italicized language omitted from District Court opinion). Here, those "other materials" encompass interrelated documents and steps.

The Restatement (Second) of the Law of Torts further illustrates the breadth of the phrase "have the effect":

> If … A induces B to sell certain goods to him and thereby causes him not to perform his contract to supply the goods to C, this may also *have the effect* of preventing C from performing his contractual obligations to supply them to D and E.

§ 767, comment (f) (emphasis added). As the Restatement observes, "C's failure to perform his contracts is a much more indirect and remote consequence of A's conduct than B's breach of his contract with C," *id.*, yet it is a resulting "consequence" of A's conduct nonetheless. *See Burrage v. United States*, 571 U.S. 204, 212 (2014) ("it is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter"). Examples are legion of similarly less-than-immediate "effects." *See, e.g.*, *Effect*,

Dictionary.com, https://www.dictionary.com/browse/effect (last visited Apr. 26, 2026) ("Exposure to the sun had the effect of toughening his skin").

The District Court's crabbed focus on what an individual step *itself immediately* achieves in isolation renders language in § 9.02(1) superfluous. Section 9.02(1) could have, yet did not, require supermajority consent only for amendments that "release" liens. By its terms, it swept more widely to encompass amendments that "have the effect of releasing" liens, ROA.117, and "courts should avoid interpretations that render contract terms meaningless or superfluous." *MeehanCombs Glob. Credit Opportunities Master Fund, LP v. Caesars Ent. Corp.*, 162 F. Supp. 3d 200, 210 (S.D.N.Y. 2015); *see also God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assoc., LLP*, 845 N.E.2d 1265, 1267 (N.Y. 2006); *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007). As expert testimony established, the "have the effect of releasing" language was "unusual," not boilerplate. ROA.10135:3-24 (Morrison Tr.). Nearly all secured note indentures have lien-release provisions, yet only 40% use broad language like "have the effect of releasing" over narrower formulations like "release." ROA.9614:16-9615:7, 10124:2-ROA.10128:19, 10134:12-10135:17 (Morrison Tr.). That choice of more expansive language must be given meaning. *Cf. Serta*, 125 F.4th at 581-82 (quoting *Quadrant Structured Prods. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014), for the canon that omitting terms "readily

found in other, similar contracts" suggests "the parties intended the omission"). And that expansiveness operates to prevent circumvention, discerning and defining any lien-releasing actions by both their immediate *and effective*, or direct *and indirect*, results.

As a functional matter, a first-step-only focus cannot be squared with the transaction's structure and mechanics. ROA.120. The first "domino" of the Third Supplemental Indenture served to trigger a resulting chain of effects. *Cf. Chain of Causation*, Black's Law Dictionary (12th ed. 2024) ("[t]he causal connection between a cause and its effects"). By that amendment, the Majority Group sought to reverse-engineer the missing supermajority consent for the remainder of the transaction. By allowing for the purported issuance of "additional 2026 notes" atop the Majority Group's existing 2026 notes to momentarily manufacture a Majority Group vote share above 66⅔%, this step was tacked on precisely to cause, bring about, and make happen all other steps of the 2022 Uptier Transaction. With the Majority Group momentarily reborn a supermajority from the boost of phantom notes, they would vote for the pre-signed, pre-consented-to, and preordained Fourth Supplemental Indenture, which would release the liens of 2026 notes and allow the issuance of new super-senior notes for which the 2026 notes were exchanged.

Each purported "step" of the transaction would occur "automatically" upon the Third Supplemental Indenture's enactment. ROA.120. The parties released *all* documents associated with the 2022 Uptier Transaction on a single closing call, and the new money went to the Company only after that. Before the closing call began, every party already had signed copies of all transaction documents—papering the issuance, voting, cancellation, and exchange alike of the "additional 2026 notes"—and all funds were already in escrow. ROA.109-110. On the call itself, the parties confirmed their assent to automatic release of each document, with no further action required of any party.[5] ROA.4455; ROA.4442. This reflected how imperative it was to the Majority Group that the 2022 Uptier Transaction be structured so that "everything happens in order and at the same time," ROA.109—further underscoring that the first step precipitated all that followed.

A first-step-only focus also cannot be squared with a "commonsense understanding of the economic substance of the transaction." *Comm'r v. Clark*, 489 U.S. 726, 737 (1989). The Majority Group required *ex ante* assurance of completion, declaring that "[w]e are funding new money and need to know that

[5] While lien-release need only constitute an "effect," the Bankruptcy Court went even further in demonstrating how the effect followed *irrevocably* under New York law escrow agreements and agency principles; the pre-release of documents and escrow payments armed the Majority Group with a right to demand specific performance of the entire transaction. ROA.121-124.

*all* consents get delivered and *the exchange actually happens*" because "[h]aving *certainty* that everyone performs under each document once this thing gets started has been a fundamental point for us from day 1." ROA.119 (emphases added); *see also id.* (the Majority Group was "not ever going to be ok removing specific performance" from the Exchange Agreement because the exchange was "a key deal point"). But for this "certainty" that the whole transaction would be completed, the Third Supplemental Indenture would never have happened.

As the Bankruptcy Court also observed, the money was being extended "at a lower interest rate" than would have made economic sense for a *pari passu* transaction. ROA.119. Indeed, the Majority Group would never self-dilute their interests through "additional 2026 notes" without being certain that those notes would be promptly exchanged for something better. Witness after witness testified that the $250 million was consideration not for the "additional 2026 notes," but for the super-senior first-lien notes the Majority Group wanted from the outset. PIMCO and Silver Point's financial advisor confirmed that they "would not have provided that new capital without also receiving super[-]senior first out debt" and that they "were not willing to do a *pari passu* transaction." ROA.7115:7-10; ROA.7117:8-21; ROA.7118:18-24. The Company's CFO "understood" that the $250 million in "new money was to be first lien, super-senior debt." ROA.5183:18-5184:3. A Board member testified that he approved

the transaction knowing that PIMCO and Silver Point were "not willing to provide new money on a *pari passu* basis." ROA.5398:1-4; ROA.5401:14-17. PIMCO's trade ticket and trade log also indicated that the new money purchased "super senior 10.5% bonds," not *pari passu* "additional 2026 notes." ROA.105294:21-105295:1.

The well-established "integrated transaction" doctrine is instructive as well. Courts routinely find that "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." *Clark*, 489 U.S. at 738. Looking to "the economic substance of the transaction," *id.* at 737, the doctrine "treats the 'steps' in a series of formally separate but related transactions … as a single transaction" if the steps are "components of an overall plan." *Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1996); *see also* 15 WILLISTON, CONTRACTS § 45:10 (4th ed. 2025) ("the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise … had been stricken"); *Nau v. Vulcan Rail & Constr. Co.*, 36 N.E.2d 106, 110 (N.Y. 1941) (documents "executed at substantially the same time, related to the same subject-matter, [and that] were contemporaneous writings … must be read together as one").

As a New York court recently explained when considering a different uptier, "[i]n determining whether contracts are separable or treated as one, the

'primary standard is the intent manifested, viewed in the surrounding circumstances'"—namely, whether the contracts "had the same purpose, were executed at the same time, and are mutually dependent" steps "in the course of the same transaction" and, "are, in the eye of the law, one instrument." *Axos Fin.*, 88 Misc. 3d 1203(A), at *13. That court interpreted "three contracts as one instrument" because they were executed at the same time and each "intended to 'eviscerate protections for the [minority] [l]enders.'" *Id.* Similarly, the Second Circuit nearly 45 years ago found a series of "piecemeal" transactions to be "part of an overall scheme" to sell all or substantially all of a bond issuer's assets, holding that the transactions should be considered together in determining whether an indenture was breached. *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1050-54 (2d Cir. 1982); *see also In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d 824, 840 (Del. Ch. 2012) (concluding, in a New York law bond indenture dispute, that "three interrelated transactions [that] will happen sequentially" should be viewed as a "single, integrated transaction").

So too here. No "steps" or nominal sequencing can detract from their mutual dependency and interrelatedness to an integrated plan. The Third Supplemental Indenture would not have been executed but for the certainty that other steps would follow. The other steps would be non-starters but for the Third Supplemental Indenture's ploy to manufacture supermajority consent. Indeed,

Wesco repeatedly described this as a single "Transaction" and as one entailing lien-release. *E.g.*, ROA.13165; ROA.13180-13181 (describing a singular "2022 Transaction" in its introductory sentence to the complaint and explaining that it entailed "releas[ing] the liens"); ROA.24974-24975 ("the 2022 [Uptier] Transaction included the release of the liens securing the then-outstanding secured notes"). At trial, the Company's CFO testified that this was a "singular transaction that was negotiated in its totality." ROA.5160:3-10. The Debtors similarly conceded that this was "one liquidity transaction" consisting of steps that were "part of the same egg that you can't unscramble." ROA.4569:13-16. PIMCO's and Silver Point's financial advisor likewise testified that "the exchange and the new money were all part of a single unified transaction." ROA.7094:20-22. Hence, while their legal arguments rely on parsing each purported individual "step" of the transaction in isolation, Appellees have repeatedly admitted that the 2022 Uptier Transaction was a "singular," "unified" whole.

The lien-release inflicted on the Minority Group was no far-flung "downstream consequence[]," ROA.4454-4455, but rather the very point of both the 2022 Uptier Transaction as a whole and the Third Supplemental Indenture itself: to "uptier" the Majority Group and subordinate all others. The District Court's stated concern about distant consequences retroactively rendering a step subject to supermajority consent is wholly inapposite. ROA.4454-4455.

Construing § 9.02(1)'s "have the effect of releasing" language in accordance with its plain meaning merely puts courts to the kind of routine judgments they make every day, as in the integrated transaction context, about whether transaction steps are independent or interrelated. *E.g.*, *Clark*, 489 U.S. at 737-38; *see also, e.g.*, *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007) (proximate causation is a "line-drawing exercise"). And it is hard to imagine a transaction where the effects of the first domino extend beyond that domino as clearly as they do here. The Third Supplemental Indenture "ha[d] the effect" of releasing liens without supermajority consent. It therefore breached § 9.02(1).

### B. The 2022 Uptier Transaction Amended Collateral-Related Provisions "In A[] Manner Adverse" to Original Noteholders Without The Supermajority Consent Required By Section 9.02(3).

Further highlighting that this indenture was among the most protective of security interests in the market, § 9.02(3) requires supermajority consent for any modifications to the security documents or the indenture's provisions "*dealing with Collateral in any manner adverse* to Holders of the [Original] Secured Notes *in any material respect*." ROA.77241. Expert testimony showed that a mere 8% of indentures combined this protection with broad language like "have the effect of releasing" as in § 9.02(1). ROA.9614:16-9615:7, ROA.10134:12-10135:17 (Morrison Tr.). Here, the Third Supplemental Indenture breached § 9.02(3) by amending collateral-related provisions "in a[] manner" manifestly "adverse" and

"material" to the original noteholders, and thus independently failed for lack of supermajority consent on this ground too.

As Appellees acknowledge in their complaint, the 2022 Uptier Transaction's first purported "step"—the Third Supplemental Indenture—sought to "expand the Company's permitted lien baskets to allow for the issuance of $250 million in additional 2026 Notes secured by the existing Collateral." ROA.24931. Their desired issuance of $250 million in "additional 2026 notes" could not be squared with the bargained-for lien baskets in the indenture, which had capped any new debt at $75 million to limit dilution. ROA.9209:11-9210:6. The Third Supplemental Indenture thus sought to expand the baskets by amending the definition of "Permitted Liens" in the indenture. Shoehorning their desired notes *into the definition itself* to render them *de facto* "Permitted," the Third Supplemental Indenture changed the definition of "Permitted Liens" to "Liens securing the [Original] Secured Notes issued on the Issue Date, *the Additional 2026 Secured Notes* and the Secured Notes Guarantees." *Compare* ROA.31846, *with* ROA.77147 (addition italicized). This not only leveraged the Company far beyond the permitted capacity, but it did so for $208 million in new money—not $250 million—with $42 million going to advisors and other transaction fees. ROA.11213:15-11214:5 (identifying $26 million in payments that went to advisors alone).

That "Permitted Liens" definition, which the Third Supplemental Indenture modified, is plainly a provision "dealing with Collateral." Just as a "Lien" is defined as any "mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect" of an asset, *including the collateral*, "Collateral" is defined "any and all assets" of the Company "*with respect to which a Lien is granted*." ROA.77140, ROA.77124 (emphases added).

Moreover, because the "Permitted Liens" definition is cross-referenced throughout the indenture, the modified definition made cascading modifications to myriad other provisions "dealing with Collateral" as well. Amending the "Permitted Liens" definition purported to amend, without supermajority consent, § 4.12(a), which bars the Company from creating or allowing "any" Lien of "any" kind "*other than Permitted Liens*." The new definition additionally amended, without supermajority consent, § 4.26, which bars the Company from further pledging any Collateral other than with "Permitted Liens." It also modified, without supermajority consent, the Notes Security Agreement, one of the indenture's "Security Documents," ROA.73790, which holds that no additional 2026 notes may issue unless there is a perfected security interest "subject to no other Liens other than Permitted Liens" and "superior to and prior to all other Liens of all other Persons (other than Permitted Liens)." ROA.44887. In short, the reverberating impact of amending the "Permitted Liens" definition—to permit

the issuance of the $250 million in additional notes that was otherwise impermissible—swept in not just the very definition itself, but every one of these collateral-related provisions.

Meanwhile, the "adverse" and "material" impact of this expansion of the "Permitted Liens" baskets on existing noteholders was *conceded* by the Company at trial. Wesco Board member and Platinum managing director Malik Vorderwuelbecke acknowledged in testimony that, when the Board approved the 2022 Uptier Transaction, the Majority Group did not hold a supermajority of 2026 notes and the Board knew that the transaction "*would harm* the excluded holders' security interest in the collateral." ROA.5401:1-4 (emphasis added). Still other witnesses acknowledged that the lien baskets had been heavily negotiated and reduced to $75 million (multiples afield from $250 million), precisely because noteholders sought to guard against dilution and restrict the extent to which existing collateral could secure more debt. *See supra* p.10 (citing testimony). The adverse effect of that dilution was further crystallized by the fact that the Company, which netted only $208 million rather than $250 million, did not even receive new money of equal value to its new debt. And its materiality was all the more extreme here, where the Company was highly leveraged and in financial distress. *Cf. Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, No. 5109-CS, 2013 WL 6327997, at *24 (Del. Ch. Dec. 4, 2013) ("to add more than the $40 million that

could be added under the accordion feature of the Credit Facility ... would dilute the collateral that secured the loans already outstanding”). While the Majority Group avoided those “adverse” and “material” consequences by exchanging their old 2026 notes and new phantom notes for new, super-senior, first-lien notes, the excluded noteholders had no such escape hatch.

The Third Supplemental Indenture—and the other dominos it caused to fall—amended multiple collateral-dealing provisions “*in a[] manner adverse to Holders*” in a “*material*” respect and thus required supermajority consent that was indisputably absent at the transaction’s start. For this independent reason, the issuance of $250 million in phantom notes was invalid, the votes cast by their holders void, and the 2022 Uptier Transaction ineffective at its first step.

### C. The 2022 Uptier Transaction Issued Additional Notes To “Directly Or Indirectly” Allow New, Impermissible Liens, Violating Sections 4.12(a) and 2.01(e).

The issuance of phantom “additional 2026 notes” also breached § 4.12(a) of the indenture, and § 2.01(e), which explicitly incorporates § 4.12(a), by directly or indirectly creating, incurring, and allowing new, impermissible liens—here, the liens securing the new, super-senior notes that were the transaction’s preordained end-result. ROA.77210; ROA.77164.

In similarly capacious terms to § 9.02, § 4.12(a) prescribes that “[t]he Issuer will not ... *directly or indirectly,* create, incur, assume or suffer to exist *any* Lien

of any kind (other than Permitted Liens), securing Indebtedness of the Issuer." *See Allow*, Black's Law Dictionary (12th ed. 2024) (equating "to suffer to exist" with "allow"). Section 4.12(a), in effect, shores up the indenture's "Permitted Liens" protection by broadly prohibiting Wesco from directly or indirectly creating, incurring, or allowing any new, non-permitted liens falling outside that definition.

Section 4.12(a)'s sweeping prohibition applies to any issuance by the Company of additional secured notes, with § 2.01(e) specifically providing that "the Issuer's *ability to issue* Additional Secured Notes *shall be subject* to the Issuer's compliance with … 4.12." Section 2.01(e) thus crystallizes that no "additional 2026 notes" may issue if doing so would "*directly or indirectly,* create*,* incur, assume or suffer to exist" any new, impermissible lien in violation of § 4.12(a). *See also* ROA.77210 (§ 4.26 similarly incorporating § 4.12 and thus providing that no existing collateral shall be further pledged if doing so would "*directly or indirectly*, create, incur, assume or suffer to exist" any new, non-permitted lien). Because the Company's very "ability to issue" those notes turns on its compliance with § 4.12, the Company *cannot* issue new notes to directly or indirectly create, incur, or allow new, non-permitted liens.

The "directly or indirectly" language is "very broad, comprehensive and all-inclusive." *Klein Coat Corp. v. Peretz*, 153 N.Y.S.2d 92, 96 (N.Y. Sup. Ct.

1956). As New York courts have emphasized, "indirectly" "signifies the doing by an obscure, circuitous method something which is prohibited from being done directly, and includes all methods of doing the thing prohibited except the direct one." *People v. Carillo*, 246 N.Y.S.2d 692, 699-700 (N.Y. App. Div. 1964). An "indirect" route is one that does "not tak[e] the straight or nearest course to the end in view," *Indirect*, Oxford English Dictionary (3d ed. 2010), or one that is "roundabout," *Indirect*, Merriam-Webster's Collegiate Dictionary (12th ed. 2025); *see also Indirect*, Ballentine's Law Dictionary (3rd ed. 2010) ("Not direct, circuitous, as an indirect road. Not leading to the fulfillment of a purpose by the plain and obvious course, but obliquely or by remote means; roundabout."). By prohibiting even "indirect" efforts to create, incur, or allow new liens, the language of § 4.12(a) staves off circumvention.

Here, the undisputed purpose of the additional notes issued via the Third Supplemental Indenture was to allow for the creation of *non-permitted* new, super-senior liens securing the Majority Group's new, super-senior notes. That allowance of new, super-senior liens cannot be pinpointed narrowly, as the District Court opinion suggests, to the *Fourth* Supplemental Indenture. Nor can the additional 2026 notes be detached from their very purpose—to vote for the pre-arranged, pre-signed Fourth Supplemental Indenture. The entire charade of issuing those notes was undertaken to concoct the requisite authorization for the

Fourth Supplemental Indenture's allowance of new liens. At minimum, Wesco's issuance of those notes "*indirectly*" created, incurred, and allowed those new, super-senior first liens.

The District Court, however, not only ignored that the 2022 Uptier Transaction resulted in new, impermissible liens, but also relied on a flawed interpretation of the indenture. In again adopting the Majority Group-penned opinion wholesale, the District Court echoed its misguided analysis on § 9.02(1) by denying that the Third Supplemental Indenture *itself* "*created* the [super-senior first] liens" prohibited by § 4.12(a). ROA.4458 (emphasis added). Reasoning that it was the *Fourth* Supplemental Indenture that *itself* allowed the new liens, the District Court deemed the nexus between the Third Supplemental Indenture and the new, impermissible liens *too* indirect to violate § 4.12(a).

That finding belies the indenture's terms. The District Court demanded a direct nexus to the new, super-senior liens where § 4.12(a) requires no such thing; the provision unambiguously bars "direct or indirect" means. And while the District Court fixated on whether the Third Supplemental Indenture "*created*" the new liens, the plain terms of § 4.12(a) go beyond that. Section 4.12(a) covers not just "creat[ing]" new liens, but "directly or indirectly[] creat[ing], incur[ring], assum[ing] or suffer[ing] to exist" such liens—words rendered a nullity under the restrictive reading below. *See Beal Sav. Bank*, 865 N.E.2d at 1219.

Section 4.12(a)'s ambit is broad, and the route by which Wesco allowed new, impermissible liens fell squarely within its ambit.

This plain reading of § 4.12(a)'s terms does not create practical difficulties with "know[ing] in advance whether any contemplated transaction would … eventually lead[] to an impermissible lien." ROA.4458. Policing end-runs that "purposely undercut" what contractual provisions were "designed to prevent" is what courts do. *Cf. Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631-32 (S.D.N.Y. 2010), *aff'd in relevant part*, 381 Fed. App'x 117 (2d Cir. 2010) (finding "end-run" around provisions to violate implied covenant of good faith and fair dealing). And the transaction here plainly reflected one integrated, coordinated means of achieving a certain end-result.

By issuing phantom "additional 2026 notes," the Company and the Majority Group tried to accomplish indirectly what they could not do directly. But because § 2.01(e) premises the Company's "ability to issue" notes on its compliance with § 4.12(a), that issuance of notes breached the indenture. The phantom notes were thus never validly issued, nor validly cast in favor of the Fourth Supplemental Indenture. Again, the 2022 Uptier Transaction failed at its first step.

### D. The District Court Hastily Rubberstamped The 2022 Uptier Transaction and Misread The Lessons Of *Serta*, and Affirming Would Upend Capital Markets.

The Bankruptcy Court recognized that the 2022 Uptier Transaction contravened the indenture and was ineffective at its first step. Notwithstanding the Bankruptcy Court's thoughtful oral and written rulings grounded in then-uncontested facts from a 35-day trial, the District Court summarily reversed at a 19-minute initial status conference. Opining from the bench on this complex, first-of-its-kind transaction, the District Court declared there to have been no breach of the indenture and, in fact, endorsed the transaction as "perfectly proper and appropriate." ROA.12171:16-18; ROA.12174:5-12.

In so ruling, the District Court undertook no independent fact-finding, though it made remarks reflecting factual misunderstandings and adopted a wholesale rewrite of the Bankruptcy Court's unobjected-to factual findings. It scheduled no oral argument, though oral argument was repeatedly requested. ROA.12173:8-19; ROA.12176:9-13. And it acknowledged that it had no "written order" prepared, explaining that its law clerks were "new." ROA.12172:9-14. Its solution was to task Appellees' counsel with drafting a rationale explicating the Court's ruling, even advising counsel that he need *not* adhere to any statements made by the Court. ROA.12176:11-24. Ultimately, the Court adopted all 40 pages of Appellee-drafted material nearly *verbatim*, adding only nine words.

That process was the epitome of rubberstamping. The Supreme Court has long "denounced" the near-verbatim adoption of findings of fact and conclusions of law prepared by prevailing parties as "an abandonment of the duty and the trust that has been placed in the judge." *United States v. El Paso Nat'l Gas Co.*, 376 U.S. 651, 656 n.4 (1964); *see also Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985) ("We … have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties...."). As this Court has explained, "[t]he practice of 'rubber-stamping' findings has been routinely discouraged" and near-verbatim recitations reflecting "minimal revision" should be "approach[ed] … with 'caution.'" *Luhr*, 157 F.3d at 338 n.4; *see also Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir. 1980) (clear-error review is relaxed where the lower court adopted one party's proposed order verbatim because the "appellate court can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered"); *Luhr*, 157 F.3d at 338 n.4 ("Stricter appellate scrutiny of 'rubber-stamped' findings by the district court is mandated in at least four other circuits."). The case for "caution" is particularly heightened here, where the Bankruptcy Court, which ruled to the contrary, presided over a lengthy trial and exhaustive deliberative process.

From what little can be gleaned from the 19-minute conference and nine words it added, the District Court appeared guided by an inapt comparison to this

Court's decision in *Serta*. It mentioned repeatedly that *Serta* included a "sacred right"[6]—referring to a provision requiring unanimous consent to amend—and that the parties here should have yet failed to include the same. *E.g.*, ROA.12171:19-24 ("if they wanted to protect against their interest being diluted by the issuance of those additional - what was it - the third supplemental indentures, they could have included that sort of protection in their … sacred rights like they did in *Serta*"). But the unanimity of the consent threshold governing the relevant provision in *Serta*—a *pro-rata*-sharing provision—had no bearing on the specific question presented to this Court. That question was whether Serta's uptier constituted an "open market purchase" that could trigger a contractual *exception* to the *pro-rata*-sharing provision, which all agreed would otherwise bar the transaction. That the *pro-rata*-sharing provision itself could not be amended without unanimous consent was irrelevant to the outcome, which turned on whether the exception—not the *pro-rata*-sharing provision—applied.

So too, the absence of a unanimous-consent protection has no bearing on the question presented here. The issue was not that 66⅔% should have been set *higher* if only the parties had negotiated for it. It was that the Majority Group was unable to attain 66⅔% and yet claimed that threshold to have been manufactured

---

[6] Some courts have referred to supermajority consent requirements as "sacred rights" as well. *E.g.*, *Axos Fin., Inc.*, 88 Misc. 3d 1203(A), at *5, 13-14.

by a *lower-than*-66⅔% share. Whether the consent threshold should have been even more heightened is beside the point.

Upholding the 2022 Uptier Transaction would render futile virtually any heightened consent threshold. Any supermajority share, be it 66⅔% or 99%, would be equally amenable to being manufactured by a simple majority. Unanimous-consent thresholds to amend lien priorities are rare. *See Serta's, Boardriders' Superpriority Uptier Exchanges Can Likely Be Replicated Under most Existing Credit Facilities*, OCTUS, at 4 (Sept. 22, 2020) (estimating that only 5 of 200 private sponsored credit agreements from 2017-2019 required unanimous consent to amend lien priorities). It cannot be that minority lenders need 100% protection or they are out of luck. A race to the bottom on sacred rights would only inject needless rigidity into indentures and impede access to capital. The answer should not be to require lenders to exhaustively block every possible avenue of circumvention, but simply to hold parties to the bargains they have struck through the reasonable reading of contracts and policing of circumventions.

In any event, *Serta*'s key takeaway was not one of sacred-rights-or-bust, but of scrutinizing uptiers, and their participants' legal justifications, with a focus on substance over form. This Court underscored the need to "look below the surface" of majority group justifications and "nominal[]" characterizations.

125 F.4th at 589, 592-93 & n.23; *see also id.* at 569 (concluding that the uptier was not, in substance, an "open market purchase," notwithstanding that the company titled a contract the "Open Market Purchase … Agreement"); *cf. In re ConvergeOne Holdings, Inc., et al.*, No. 24-bk-90194 (Bankr. S.D. Tx. Sept. 25, 2025) (ECF No. 614 at 21) (noting that "*Serta* rejects a surface-level or overly formalistic (or simplistic) inquiry" into equal treatment of lenders).

Those lessons warrant similarly probing below the surface of the Majority Group's self-serving characterizations and attempts to paper the 2022 Uptier Transaction as a series of nominally sequenced, independent "steps." None of that should elide the reality that the issuance of "additional 2026 notes" was an illusory step and this was, in substance, one integrated domino agreement whose interrelated components rose and fell together. In fact, the 2022 Uptier Transaction stands on weaker ground than the Serta uptier, where the company at least identified contractual language—the "open market purchase" exception—that it claimed would authorize the uptier. Here, Appellees do not identify any express contractual hook and rely only on elisions of the express contractual bars.

If affirmed, the 2022 Uptier Transaction would set a roadmap for replication. Whenever efforts to buy up notes are unavailing, or in lieu of such efforts altogether, those unable to reach the requisite consent can simply bridge the gap with manufactured consent and the façade of phantom notes. It will mean

that admittedly lacking the requisite consent when a transaction commences is not the end of the inquiry, merely the start—inviting more maneuvering and the very line-drawing quandaries the District Court warns of. It will embolden majority groups of lenders to roll the dice and eviscerate excluded lenders' security interests with still more cleverly packaged side deals. And it will incentivize such groups to dare excluded lenders to take on the brunt of litigation, knowing that even if the excluded lenders ultimately prevail in court, they may risk being left with no meaningful remedy. *See infra* Part II.

Billions of dollars of credit decisions hinge on bedrock principles of contract reliance and predictability. *See Sharon Steel*, 691 F.2d at 1048 ("uniformity in interpretation is important to the efficiency of capital markets."). The indenture here *did* contract around these risks, from requiring supermajority consent to including capacious language protecting against lien-release in § 9.02(1), guarding against amendments of collateral-related provisions in § 9.02(3), and restricting the allowance of new, impermissible liens in §§ 4.12(a) and 2.01(e). The Minority Group went to great lengths to promote certainty—even ensuring that they controlled more than one-third of the notes, which should have prevented this very outcome—and still saw the rug pulled out from under them. If the 2022 Uptier Transaction is left to stand, confidence in contractual

commitments will be fundamentally upended, and the reverberations would be felt in our capital markets.

## II. THE DISTRICT COURT'S "REMEDY" FOR THE BREACH WAS NO REMEDY AT ALL

The District Court, having found no breach, proceeded to opine that even if it had found otherwise, it would have denied the Minority Group any remedy but money damages. ROA.4465. This was unnecessary and erroneous. It parrots the most brazen of propositions by Appellees—that *irrespective* of whether any breach occurred, the resulting holders of new super-senior notes should retain the benefit of that breach, and the secured noteholders whom they aggressively stripped of all their security interests should be left wholly unsecured. That gets things backwards and is manifestly no "remedy" at all.

Here, the breach of contract—whereby the Minority Group's liens were stripped and their collateral re-pledged to secure new super-senior, first-lien notes of the Majority Group—changed the Minority Group's secured status, but not the money they are owed. Indeed, the money the Minority Group invested in Wesco and is owed by Wesco on their 2026 notes is baked in. Win or lose on breach, nothing about that duly-owed money changes. What does drastically change—and the reason why the parties sought competing declarations on breach—is whether the 2022 Uptier Transaction was effective in altering the rights, liens, and interests of the 2026 noteholders. In short, what hangs in the balance is whether

the transaction validly uptiered the Majority Group and upended the security interests of all others.

The Bankruptcy Court concluded that the 2022 Uptier Transaction was ineffective at its first step, passed as it was without supermajority consent, and that the transaction therefore failed. *See* ROA.123 (transaction's "fail[ure] at the execution of the very first document" thus "negates the effectiveness against the 2026 Noteholders of every subsequent step," including the Fourth Supplemental Indenture's lien-release). It therefore declared that the "rights, liens, and interests" of the 2026 noteholders remained as they were pre-Transaction. ROA.124. That holding was not simply the natural implication of its breach holding on § 9.02(1)—and the transaction's independent breaches of §§ 9.02(3), 4.12(a), and 2.01(e)—but the only reasonable takeaway. Because the 2022 Uptier Transaction failed and its lien-stripping was deemed ineffective, it would make no sense to treat the Minority Group as stripped of their liens. Fixing the rights, liens, and interests of the 2026 noteholders at a *post*-Transaction baseline—with an uptiered Majority Group and unsecured Minority Group—would contradict the holding that the transaction was never properly effectuated.

By contrast, the Bankruptcy Court's recognition of the *pre*-Transaction "rights, liens, and interests" of the 2026 noteholders accords with the fundamental principle that no wrong should be suffered without a remedy. *See Jones v.*

*Campbell-Taggart Associated Bakeries*, 63 F.2d 58, 60 (5th Cir. 1933) (it is fundamental that "equity looks to the intent rather than the form, and *will not suffer a wrong without a remedy*") (emphasis added). Texas law—which governs remedies here—is clear that equitable remedies are available as "a substitute for monetary damages when such damages would not be adequate." *S. Cent. Jurisdictional Conf. of United Methodist Church v. S. Methodist Univ.*, 674 S.W.3d 334, 368 (Tex. App. 2023), *aff'd in part, rev'd in part sub nom.*, 716 S.W.3d 475 (Tex. 2025).

Extensive authority establishes that a plaintiff's loss of "title and possession of its collateral, stock, and assets" is a prime example of when damages are inadequate. *Frontera Generation Ltd. P'ship v. Mission Pipeline Co.*, 400 S.W.3d 102, 107 (Tex. App. 2012); *see also 31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 926 (Tex. App. 2022) (surety lacked adequate remedy where indemnitors failed to deposit collateral security pursuant to indemnity agreement); *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 769 (Tex. App. 2017) (affirming decision finding irreparable injury due to "loss of the collateral secured by [Appellants'] loans"); *In re BankAtlantic Bancorp*, 39 A.3d at 847 (applying New York law and citing cases holding that a lender is irreparably harmed when it loses its security). A secured creditor does not have an adequate remedy at law when it loses its security. Secured status encompasses rights beyond the mere right to

repayment, including the right to foreclose and exercise other remedies in collateral, and in bankruptcy, priority over unsecured creditors and protections under the Bankruptcy Code.

Courts also routinely consider the validity and priority of security interests under the Declaratory Judgment Act. *E.g.*, *In re First River Energy, L.L.C.*, 986 F.3d 914, 929 (5th Cir. 2021) (affirming bankruptcy court's order declaring priority of disputed liens); *Doody v. Ameriquest Mortg. Co.*, 242 F.3d 286, 288 (5th Cir. 2001) (dispute over the validity of lien appropriate for declaratory relief); *cf. BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 2013 WL 1290394, at *5-6 (N.Y. Sup. Ct. Mar. 8, 2013), *aff'd*, 978 N.Y.S.2d 10 (N.Y. App. Div.) (holding an unauthorized transaction void *ab initio* under New York law and granting declaratory relief that a purported amendment to a credit agreement "[was] not, and never was, effective").

The District Court's acceptance of what is effectively an unsecured claim for money damages as the remedy for this breach is not only wrong, but it sets a dangerous precedent for capital markets. Studies have found that an astonishing 56% of companies that execute uptiers or other coercive liability management exercises and have two years of post-transaction history file for bankruptcy, while, among those with three years of post-transaction history, 71% file for bankruptcy. *See* Mark J. Roe & Vasile Rotaru, *Liability Management's Limited Runway:*

*Corporate Restructuring Today*, 136 Yale L.J. (forthcoming 2026) (p.11-12) (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6103369). A mere 7% of companies with three years of post-transaction history avoid bankruptcy or new defaults. *Id.* If an unsecured claim were truly the only remedy available to minority lenders in the face of a breach, every future majority group would be incentivized by a "heads-I-win, tails-you-lose" remedies regime to wrest fellow secured lenders of their security interests. Even if the transaction is ultimately determined to be a breach, that company will in all statistical likelihood file for bankruptcy, leaving the breaching party with the benefit of an improved position in the capital structure, and the victims with nothing but unsecured claims against a bankrupt entity.

As the Bankruptcy Court observed, giving the Minority Group "just an unsecured claim that they already have" against the Company—one that is effectively worthless—"gives them zero relief." ROA.12095:14-15. Nor would it fulfill any remedial purpose to leave those who engineered the breach with the fruits of such breach. The Bankruptcy Court thus stated to Majority Group's counsel at trial that "if what I do is award money damages, then your clients get the entire benefit of their bargain knowing that they cheated." ROA.12088:15-17. If a breach finding were to culminate in a toothless remedy, no minority group would ever challenge an unlawful uptier, and no company or majority group

would ever hesitate in the face of litigation risk to lay waste to their contracts for aggressive and exclusionary ends.

In justifying the damages remedy, the District Court reasoned that "[b]ankruptcy does not … afford plaintiffs who sue bankrupt defendants additional remedies that would otherwise be unavailable." ROA.4464. But the Minority Group sued Wesco well before Wesco declared bankruptcy. In doing so, they sought this same relief—a "declaratory judgment that the Sham Transaction, including the Unauthorized Amendments, is null and void and not enforceable" and a "restor[ation] [of] the status quo ante, such that all Liens, Collateral rights, Security Documents, and/or any other affected rights or instruments are restored to the same position as if the Sham Transaction were never undertaken," *SSD Investments Ltd., et al. v. Wesco, et al.*, No. 654068/2022 (N.Y. Sup. Ct.) (Doc. No. 2 at 67)—leaving no doubt that such relief is available outside bankruptcy. Nothing about the subsequent bankruptcy filing could preclude that relief or require "a suboptimal remedy of money damages." *In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993). To the contrary, the Company's insolvency reinforces the inadequacy of damages. *See Texas Indus. Gas v. Phoenix Metallurgical Corp.*, 828 S.W.2d 529, 533 (Tex. App. 1992) ("insolvency can be a factor in determining whether there is an adequate remedy at law"). Here, the inadequacy is exceptionally stark: Reinstatement of the Bankruptcy Court's remedy would

amount to an approximately one-quarter stake in the Company's post-bankruptcy enterprise value worth hundreds of millions of dollars—versus, in practical terms, nothing. *See In re Wesco Aircraft Holdings, Inc., et al.*, No. 23-bk-90611 (Bankr. S.D. Tx. Dec. 26, 2024) (ECF No. 2083-5 at 3) (valuation analysis).

What's more, the fact that the Company has since emerged from bankruptcy only underscores that reinstating the Bankruptcy Court's remedial holding would simply hew to the *status quo*, not disrupt or unwind it. The Bankruptcy Court's recognition of the 2026 noteholders pre-Transaction "rights, liens, and interests" was the baseline from which the parties reached the current consensual allocation of equity and notes in the Company's confirmed plan of reorganization. As the plan makes clear, "[t]he treatment provided under this Plan on the Effective Date … is based on the Bankruptcy Court's rulings in the [Company's adversary proceeding against the Minority Group]." *Id.* (ECF No. 2517 at 100); *see also In re Wesco Aircraft Holdings, Inc., et al.*, No. 25-cv-00161 (S.D. Tx. Dec. 22, 2025) (ECF No. 22 at ¶2) ("the confirmed plan of reorganization … was substantially based upon the Bankruptcy Court's recommendation to enter judgment for the 2026 Noteholders on their breach-of-contract claims."); *id.* (ECF No. 5 at ¶2) (similar). Reinstatement of the Bankruptcy Court's recommendation would simply maintain what has already been implemented.

At bottom, this Court should preserve the benefit of the bargain for the excluded noteholders, not for those who engineered the breach. Recognition that the excluded noteholders' pre-breach positions remain in full force and effect is the only reasonable remedy under the circumstances.

## CONCLUSION

For the foregoing reasons, the Court should reverse the District Court's decision and remand for entry of judgment in Appellants' favor consistent with the Bankruptcy Court's Report and Recommendation.

Respectfully submitted,

*<u>/s/ Candice C. Wong</u>*

Candice C. Wong
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
801 17th Street, NW
Washington, DC 20006
(202) 639-7000
Candice.Wong@friedfrank.com

Samuel P. Groner
Jason S. Kanterman
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
Samuel.Groner@friedfrank.com
Jason.Kanterman@friedfrank.com

Zachary D. Rosenbaum
Adam M. Lavine
Darryl G. Stein
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200
Zachary.Rosenbaum@kobrekim.com
Adam.Lavine@kobrekim.com
Darryl.Stein@kobrekim.com

*Counsel for Appellants*

April 29, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2026, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

*/s/ Candice C. Wong*
Candice C. Wong

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 12,959 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman font in 14-point size.

*/s/ Candice C. Wong*
Candice C. Wong